[Civ. No. 14230. Fourth Dist., Div. One. Jan. 22, 1976.]

DYNAIR ELECTRONICS, INC., Plaintiff and Appellant, v.
VIDEO CABLE, INC., et al., Defendants and Respondents.

12

---

**COUNSEL**

Klitgaard & Jones, Darvy Mack Cohan and S. Frank Griswold for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps and Michael L. Kirby for Defendant and Respondent Maurer.

No appearance for other Defendants and Respondents.

## OPINION

**BROWN (Gerald), P. J.**—Dynair Electronics, Inc. and Dyna-Cable, Inc. appeal a two-count judgment—each count involving different legal issues and different parties—following a trial by the court.

### I

In April 1971, Frank Castro, Bob Richardson, Donn Maurer and Michael Grupp formed a general partnership, Video Cable Service (VCSG), pursuant to an oral agreement. VCSG engaged in the business of contracting for the construction, installation, and financing of Master Antenna Television systems (MATV). Once VCSG obtained a contract, it would hire Castro (dba Video Cable) to actually install the systems. Castro, Richardson, and Maurer each had a 30 percent interest in VCSG; Grupp had the remaining 10 percent.

From April to September 1971, Maurer periodically advanced monies (totaling $23,100) to VCSG as loans to finance its operations. (Apparently none of the partners made capital contributions when VCSG was formed.) During this same period VCSG entered into eight contracts: Mission La Vega, Mollison Townhouses, Wintergarden Greens Apartments, Jamacha Village (all negotiated with McKeon Construction Company, executed on May 13, 1971, by Castro on behalf of VCSG), Mission Knolls (Riddlespurger & Associates, executed Aug. 18, 1971, by Castro for VCSG), Royal Gardens, Pepper Hills Townhouses, and Iris Gardens Townhouses (McKeon Construction Company, executed Sept. 1, 1971, by Castro for VCSG). The monies loaned by Maurer were used to obtain and to perform these contracts.

However, during October and November 1971 VCSG needed financing beyond what Maurer was willing to supply, and other disagreements among the partners arose. On November 6, VCSG was dissolved and its successor, a limited partnership also named Video Cable Service (VCSL), was formed. Under the termination agreement Grupp withdrew from the business altogether, receiving a promissory note executed by Castro and Richardson in the face amount of $4,000 in payment of his 10

percent interest in VCSG. Maurer relinquished his interest in VCSG receiving in exchange a promissory note in the face amount of $10,000 executed by Castro and Richardson jointly and severally and a 2 percent limited-partner's interest in VCSL. Castro and Richardson were the general partners of VCSL, each having 49 percent interests. VCSG transferred all its assets to VCSL, and VCSL assumed all liabilities of VCSG. As a part of this same transaction, Maurer received another promissory note in the face amount of $23,100, evidencing his previous loans to VCSG. Liability for the payment of the $23,100 note was expressly assumed by VCSL.

Both promissory notes received by Maurer had the following provision: "This note is secured by a Security Agreement of this date." In the Security Agreement referred to in the promissory notes, Castro and Richardson, apparently on behalf of themselves, VCSL, and Video Cable, granted a security interest in basically all of the assets of VCSL (including the eight MATV installation contracts), agreeing the security interest would attach to the described collateral immediately upon execution of the agreement (Nov. 15, 1971). On November 17, Maurer properly filed a financing statement (form UCC-1), thus perfecting his security interest as of that date.

Also during October and November 1971, Castro began negotiations with Dynair Electronics, Inc. (Dynair) with a view toward establishing a new entity which would enter the MATV business. Castro offered to contribute his expertise in the MATV field as well as the existing executory contracts, for which Dynair would provide the sorely needed financing.

On November 24, Castro, E. G. Gramman as president, and R. J. Klitgaard as secretary of Dynair, executed a pre-incorporation agreement (dated Oct. 1, 1971) in which the parties agreed to and did form a new corporation, Dyna-Cable, Inc. (Dyna-Cable). Dynair contributed $12,100 cash and received 12,100 shares of Dyna-Cable stock. Castro agreed to transfer the Mission La Vega and Mission Knolls contracts "by warranty bill of sale free and clear of all liens and encumbrances," for which he would receive 9,900 shares of Dyna-Cable stock. Gramman was to be president of Dyna-Cable and Castro, vice president.

The pre-incorporation agreement obligated Dynair: "To provide or procure loans to Dyna-Cable, Inc., if Dyna-Cable, Inc. is unable to obtain its own financing, to finance the installation of [MATV] systems

on a timely basis to enable Dyna-Cable to finance Castro construction. Said loans shall be evidenced by promissory notes bearing interest at the rate of 1% over Chase Manhattan prime, adjusted quarterly, and shall be secured by financing statements and security agreements on the systems which are installed with the aid of such financing." Dynair also agreed to "cause Dyna-Cable to [sub]contract with Castro [or his company, Video Cable] for the installation and maintenance of cable television systems . . . ." Thus, Dyna-Cable would function in a capacity similar to VCSG—it would handle contract negotiations, subcontract, and funnel funds from a lender to the subcontractor. All-told, Dyna-Cable negotiated and obtained 13 contracts, over and above the 8 contracts originating from the VCSG entity. Castro or his company, Video Cable (which was later incorporated as Video Cable, Inc.), installed all the systems under these contracts.

On December 23, 1971, Castro, on behalf of VCSL, conveyed the Mission La Vega and Mission Knolls contracts to Dyna-Cable. Apparently both systems were completed at this time. On January 6, 1972, Dyna-Cable issued its purchase order-contract to Castro and/or Video Cable, Inc. for installation of the MATV systems in the six remaining VCSL contracts. This purchase order-contract provided: "Castro will execute a security agreement on the entire construction noted above in favor of Dyna-Cable. Upon completion of each project noted above, Castro will execute a bill of sale, passing title on the system to Dyna-Cable, such title to be free of any liens or encumbrances." Castro, on behalf of Video Cable, Inc., executed a series of promissory notes consistent with this clause. Dynair procured the funds advanced through Dyna-Cable to Video Cable, Inc. and Castro. Over a period of months a total of $124,600 flowed through to Castro and Video Cable, Inc. for installation costs of various MATV systems.

On July 27, 1972, after a series of negotiations, Dyna-Cable sold all its assets to Dynair, the assets to be subject to all of Dyna-Cable's liabilities as of July 31. Through this conveyance, Dynair claims title to the eight contracts originally held by VCSG, among others not at issue in this appeal.

The series of transactions set out above generated three lawsuits. In February 1972, Maurer filed suit on the two promissory notes which were in default (Super. Ct. No. 331054). In July 1972, Castro and Video Cable, Inc. filed suit against Dynair and Dyna-Cable concerning the operation of Dyna-Cable (Super. Ct. No. 335224). Finally, on September 22, 1972,

Dynair and Dyna-Cable filed the complaint which gives rise to the present appeal (Super. Ct. No. 336428). All three actions were consolidated for trial only.

In the Dynair action (No. 336428) the first cause of action was for an accounting, but was directed against Castro and Video Cable, Inc., who have not filed briefs in this appeal. There were no allegations against Maurer in this count. The second cause of action was to quiet title in favor of Dynair in the eight MATV contracts originally held by VCSG (among others which have no effect on the parties to this appeal) and it contained specific allegations contesting the validity of Maurer's security interest perfected on November 17, 1971, in these eight contracts. Maurer cross-complained asserting his superior interests in the eight contracts under the November security agreement. The trial court quieted title in favor of Dynair in all except the eight contracts, concluding Maurer's security interest established senior rights in the collateral. The trial court also granted judgment on the two promissory notes in favor of Maurer (No. 331054).

II

In its appeal in the quiet title action, Dynair's sole contention is the reduction or sale of Maurer's partnership interest in VCSG, and the transfers attending the simultaneous dissolution of VCSG and creation of VCSL, together constitute a sale of "contract rights" as a part of the sale of the business out of which they arose. If this contention is correct, California Uniform Commercial Code section 9104, subdivision (f), precludes the creation of a security interest in the "contracts rights."

Three California Uniform Commercial Code sections bear upon this contention.[1] First, section 9102, which sets forth the scope and policy of division 9, and reads in pertinent part:

"(1) Except as otherwise provided in Section 9103 on multiple state transactions and in Section 9104 on excluded transactions, this division applies so far as concerns any personal property and fixtures within the jurisdiction of this state.

---

[1]The sections quoted were amended by Statutes 1974, chapter 997, effective January 1, 1976, to delete all references to the term "contract rights," inter alia. However, the definition of the term "account" has been expanded to include contract rights (Compare former Cal. U. Com. Code, § 9106 with the current § 9106). Thus the amendments have no substantive effect on the issues presented here (see Cal. U. Com. Code, §§ 11101, 11103, 11108).

"(a) To any transaction (regardless of its form) which is intended to create a security interest in personal property including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and also

"(b) To any sale of accounts, contract rights or chattel paper . . ."

Second, section 9104, which excludes certain transactions and reads in part:

"This division does not apply

"(f) To a sale of accounts, contract rights or chattel paper as part of a sale of the business out of which they arose . . ."

And third, section 9106, which defines terms used in sections 9102 and 9104 which reads: " 'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper. 'Contract right' means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper. 'General intangibles' means any personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents, and instruments. Any interest or claim in or under any policy of insurance is a general intangible."

Each of the eight MATV installation agreements provided VCSG would install and operate, at no cost to the developer, a master antenna distribution system in consideration for the exclusive right to rent the hookups to the individual tenants of each development. Each developer normally agreed to prohibit use of outside antennas by his tenants. Thus, VCSG was to install cable television hookups in buildings under construction and was granted an exclusive license in return. VCSG was not granted a right to a money payment from any of the developers in any of the eight contracts.

In the former section 9106 "account" is defined in terms of a right to payment earned by performance, and a "contract right" in terms of payment not yet earned by performance. By distinguishing the two terms by reference to performance, a "contract right" can accurately be deemed a potential account (former Cal. U. Com. Code, § 9106, Cal. U. Com. Code comment). General intangibles are defined as personal property other than accounts or contract rights inter alia. Examples of

general intangibles include "miscellaneous types of contractual rights" and "rights to performance" (former Cal. U. Com. Code § 9106, Cal. U. Com. Code comment). The evidence shows none of the eight MATV agreements had been completed at the time Maurer received his security interest. Therefore, under the definitions of former section 9106 the collateral must be classified as either contract rights or general intangibles—the significance being only contract rights are subject to the section 9104, subdivision (f), exclusion.

Because a general intangible can be a contract right or a right to performance, the basis for distinction between a contract right and a general intangible must lie in the "right to payment" language used to describe a contract right. While a "payment" can refer to a transfer of something of value other than money (*Sousa* v. *First California Co.,* 101 Cal.App.2d 533, 540 [225 P.2d 955]; see Civ. Code, § 1478), in view of the fact general intangibles include contract rights and rights to performance, the term "payment" can be the basis for a distinction between a contract right and a general intangible only if it refers to the transfer of money.

As noted previously, section 9106 has been amended to abolish the distinction—based on whether the payment has been earned by performance—between an account and a contract right.[2] Since the amendment is functional, definitional, but not substantive, the newly amended section is deemed declaratory of the meaning of the code as it existed before January 1, 1976 (Cal. U. Com. Code, § 11108). Reference to section 9106, and especially to the California Uniform Commercial Code comment under that section, removes any doubt the former section was intended to define the terms "account" and "contract right" in terms of a right to payment of money. As consistent with this conclusion, it should be noted section 9106 specifically excludes money as a general intangible.

█ The eight MATV installation agreements and the "rights" under those contracts used as collateral to secure the payment of the two promissory notes are thus general intangibles under the California Uniform Commercial Code since none of the "rights" are for a payment of money. The creation of a security interest in general intangibles is

---

[2] Section 9106 now reads: " 'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. 'General intangibles' means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money. . . ."

governed by section 9102, subdivision (1)(a), and is not affected by the section 9104, subdivision (f) exclusion. The fact the parties intended to create a security interest is not contested; the form of the transaction (whether a part of a sale of a business or otherwise) is not relevant to the validity of the security interest (Cal. U. Com. Code, § 9102, subd. (1)(a); Cal. comment No. 2, U. Com. Code comment No. 1); and Dynair does not otherwise challenge the validity of the security interest. Therefore, the judgment of the trial court in the quiet title action must be upheld.

## III

In the first cause of action Dynair and Dyna-Cable sought an accounting for all monies loaned to Castro and Video Cable for the purpose of constructing MATV systems. Upon stipulation of the parties, the trial court appointed Arthur Young & Company as a referee. The referee was ordered to prepare an audit tracing the Castro and Video Cable application of funds advanced by Dynair and Dyna-Cable.

Dynair made a motion for the trial court to accept the referee's report as a special verdict under Code of Civil Procedure section 645. The trial court denied the motion but received the report in evidence as an expert opinion. The report showed Dynair, either directly or through its conduit Dyna-Cable, advanced $124,600 to Castro and Video Cable during the period October 1, 1971, to July 31, 1972. The referee could trace or allocate only $83,537 to construction of MATV systems for Dyna-Cable, $41,063 remaining unaccounted. The trial court reduced the $41,063 figure by $10,847, rendering a judgment in favor of Dyna-Cable in the amount of $30,216.[3]

On appeal Dynair, as successor of Dyna-Cable, challenges the $10,847 reduction on alternative theories. First, Dynair contends the trial court erred when it denied the motion to accept the referee's report as a special verdict, thus the $41,063 would be the amount due Dynair. Alternatively, Dynair argues the evidence does not support the findings necessarily made by the trial court to reach its conclusion only $30,216 was due Dynair.

---

[3]The action was initiated by Dynair and by Dyna-Cable, yet the judgment was rendered in favor of Dyna-Cable only. This, no doubt, reflects an oversight in drafting the findings and the judgment.

## A.

The appointment of a referee pursuant to an agreement of the parties is governed by Code of Civil Procedure section 638. That section provides for a general reference which essentially delegates to the referee the power to make findings of fact and conclusions of law (Code Civ. Proc., § 638, subd. 1 and § 644; *Fredendall* v. *Shrader,* 45 Cal.App. 719, 723 [188 P. 580]); and for a special reference in which the referee is appointed to ascertain a fact necessary to aid a court in reaching its decision (Code Civ. Proc., § 638, subd. 2; *Ellsworth* v. *Ellsworth,* 42 Cal.2d 719, 722 [269 P.2d 3]; *Estate of Johnston,* 12 Cal.App.3d 855, 859 [91 Cal.Rptr. 116]; *Estate of Bassi,* 234 Cal.App.2d 529, 536-537 [44 Cal.Rptr. 541]; *San Diego Fruit & Prod. Co.* v. *Elster,* 127 Cal.App.2d 80, 85 [273 P.2d 70]). In a general reference, consented to by all the parties, the factual and legal determinations of the referee are binding (Code Civ. Proc., §§ 638, subd. 1, 644). In a special reference, the referee's findings of fact are binding only if so accepted by the trial court, and are accurately characterized as advisory (*Ellsworth* v. *Ellsworth, supra,* 42 Cal.2d 719, 722). If a special referee's findings are accepted by the trial court, they are treated as a special verdict (Code Civ. Proc., § 645). Thus before a special reference is accorded the status of a special finding of fact, the trial court must have accepted it as such; otherwise the report, if admitted into evidence, is treated as any other evidence.

Here the trial court elected to treat the referee's report as evidence only, thus providing the latitude to consider other evidence in making its ruling in the accounting action. The election was proper and no abuse of discretion appears.

## B.

In January 1972, pursuant to the pre-incorporation agreement, Dyna-Cable issued its first (of three) "purchase order" to Video Cable. Essentially the purchase order was a contract under which Dyna-Cable hired Video Cable and its owner, Castro, to install MATV systems at cost plus 10 percent (less any funds advanced plus interest). Video Cable or Castro, upon the completion of each system, was to convey it to Dyna-Cable by a bill of sale free and clear of all liens and encumbrances.

The first contract called for the installation of 7 systems (1,649 units) during the period October 1, 1971 to January 6, 1972. Castro

signed three promissory notes under this contract for cash advances totaling $30,100. The contract recited $33,500 had been advanced to Castro and Video Cable. The $3,400 difference represented an advance made directly by Dynair to Castro, before Dyna-Cable had been formed. The $3,400 was advanced by Dynair to enable Castro to remove encumbrances on the Mission La Vega and Mission Knolls systems. (The Mission La Vega and Mission Knolls systems were later conveyed to Dyna-Cable on December 23, 1971, pursuant to the pre-incorporation agreement and thus were not included in the first or any other purchase order-contract between Dyna-Cable and Castro.)

Of the total cash advances of $124,600, $114,100 was evidenced by promissory notes executed by Castro under the purchase order-contract arrangement outlined above. Of the $10,500 amount not represented by promissory notes, $3,400 was included in the purchase order just discussed. The remaining $7,100 was never included in any contract between Dynair or Dyna-Cable and Castro or Video Cable, nor was a promissory note ever executed. The $7,100 was advanced directly by Dynair to Castro (before Dyna-Cable was formed and before the pre-incorporation agreement was signed) to pay off materialmen encumbrances on the Mission La Vega and Mission Knolls systems.

With respect to the $7,100 advance, the trial court found: "Castro does not owe and is not required to repay to DYNAIR said $7,100.00." Dynair and Dyna-Cable contend the finding is not supported by the evidence and that the judgment should be increased accordingly.

When asked about the $7,100 advance, Castro testified the money was "To pay off some encumbrances. It was actually a loan to me personally, I believe, that was figured out some way as a loan." Castro also said he executed a promissory note covering this advance. No note covering this transaction was offered in evidence, however. The testimony of Dyna-Cable and Dynair financial officers were consistent with Castro's version of the transaction.

As obligated by the pre-incorporation agreement, Castro conveyed the Mission La Vega and Mission Knolls systems to Dyna-Cable and received in exchange 9,900 shares of stock; and Dynair transferred $12,100 to Dyna-Cable and received 12,100 shares of stock. Thus the only apparent theory upon which the trial court could have based its finding (i.e., Dynair forgave the debt in consideration of Castro's transfer of these systems) appears nullified. There is no evidence tending to show

the $7,100 debt (or the $3,400 debt for that matter) was ever repaid or forgiven by Dynair. Consequently, plaintiff's judgment should be increased by $7,100.

C.

Dynair also challenges the reduction of $3,747 from the $41,063 amount in the referee's report.

In preparing its reports the referee reviewed the accounting records of Video Cable and, since that corporation installed MATV systems for clients other than Dyna-Cable, general expenses such as salaries, insurance, taxes, advertisements, etc., had to be allocated to Dyna-Cable's projects. This allocation involved numerous accounting assumptions.

As one such assumption, the referee refused to allocate any part of Castro's salary as president of Video Cable to any of Dyna-Cable's MATV systems. The referee justified this as a generally accepted accounting technique, on the theory such officers normally spend their time on general administrative duties rather than direct supervision of particular projects. The referee also pointed out Video Cable employed a construction supervisor whose salary was allocated. The evidence also showed this supervisor was employed only during a part of the 10-month auditing period; that Video Cable was a close corporation with relatively few employees; and, Castro had a strong personal influence on the entire operation of Video Cable.

From this evidence the trial court could reasonably allocate a percentage of Castro's salary directly to the Dyna-Cable projects notwithstanding generally accepted accounting principles.

Accordingly, the judgment of the trial court in the accounting action is modified by denominating both Dynair Electronics, Inc. and Dyna-Cable, Inc. as plaintiffs, and by increasing the judgment rendered in their favor by the amount of $7,100, totaling $37,316.

As modified, the judgment is affirmed.

Ault, J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 18, 1976.