Cheshire,
No. 6436.

MEINHARD-COMMERCIAL CORPORATION

*v.*

HARGO WOOLEN MILLS & *a.*

December 29, 1972.

*Devine, Millimet, Stahl & Branch* and *Robert A. Backus* (*Mr. Backus* orally) for Meinhard-Commercial Corporation.

*McLane, Carleton, Graf, Greene & Brown (Mr. Stanley M. Brown* orally) for Lazer Shabry, d.b.a. Shabry Trading Company.

Grimes, J. The issue presented by this case is the correctness of the master's rulings as to who has ownership or title in the disputed goods. Hargo Woolen Mills, Inc., and its wholly-owned subsidiary, Wallisford Mills, Inc., were respectively the seller and the manufacturer of woolen cloth. Meinhard-Commercial Corporation, the factor for and principal secured creditor of Hargo, instituted equity receivership proceedings against Hargo and Wallisford. On December 15, 1967, the Cheshire County Superior Court appointed a receiver who took possesion of Hargo's and Wallisford's assets.

Shabry Trading Co. was in the business of trading waste material and for over ten years prior to the receivership had sold card waste, used in the production of cloth, to Hargo.

On or about May 17, 1966, Shabry shipped and invoiced to Hargo twenty-four bales of card waste. Hargo did not wish to purchase the material at that time and so on May 24, 1966, Shabry and Hargo made an oral agreement whereby Hargo was to store the goods on its premises but was not to pay for or be charged for the goods until Hargo notified Shabry that it was using them in its mill operation. Hargo returned the invoice for the goods to Shabry. Shabry marked the invoice "pro-Forma" and returned it to Hargo. This invoice fixed the price at which these bales could be purchased by Hargo. In September of 1966 Hargo notified Shabry that it could use eight bales. Shabry invoiced them as of the original invoice date of May 17, 1966; Hargo had this revised to September since the parties had agreed Hargo was to be billed only at the time it used the goods. Hargo then used the goods and Shabry received part payment for the eight bales (the balance being lost to Shabry as a general creditor in the receivership).

The remaining sixteen bales were never used by or billed to Hargo except upon the "pro-forma" invoice of May 17. The receiver took possession of the bales on or about December 15, 1967.

Shabry on February 21, 1968, demanded possession of the sixteen bales from the receiver, claiming that Hargo never owned the bales since title was retained by Shabry until use of the bales by Hargo. The receiver sold the sixteen bales, and pursuant to the final decree by the Superior Court in the receivership proceedings (*Dunfey,* J.) on March 27, 1969, a sum of $7,500 covering the value of the bales was delivered by the receiver to a joint account of Shabry's and Meinhard's counsel, subject to further proceedings of the superior court to determine Shabry's claim. This final decree also found Meinhard the holder of a first lien against all of Hargo's inventory and proceeds thereof and as such the residuary beneficiary of all of Hargo's funds, credits and deposits after payment of certain specific items, none of which are in issue here except for the purported claim of Shabry. The court obliged Meinhard to defend the claim of Shabry on behalf of Hargo's receiver. There was no evidence that Meinhard relied on the card waste as belonging to Hargo in extending its credit.

Meinhard and Shabry subsequently appeared before a master to settle the issue of whether Shabry had retained title to the sixteen bales of card waste prior to Hargo's receivership or whether title had passed to Hargo prior to receivership. The Master, *N. Michael Plaut,* found as a matter of law under RSA 382-A:1-201(37) and 2-401(1) that when Shabry delivered the bales to Hargo, title passed to Hargo and a security interest was concurrently created for Shabry. Shabry, never having perfected his security interest in the goods prior to appointment of the receiver, was left in the status of an unsecured creditor of Hargo.

The master found as a matter of fact that Hargo and Shabry believed and intended that title to the sixteen bales would not pass until Hargo notified Shabry of their use. Hargo was under no obligation to buy and Shabry was free to sell the goods to other buyers. Hargo never took the sixteen bales into its inventory and the bales were separately stored and distinctly marked as not being included in Hargo's general raw materials inventory.

The master's report was approved by the Superior Court

(*Loughlin,* J.) subject to Shabry's exception and the case was transferred to us reserving all questions of law raised by the parties' exceptions of record.

The utilization of the concept of title in sales transactions is not novel, nor is the misconception and the misuse of it. Learned Hand has said: "'[T]itle' is a formal word for a purely conceptual notion; I do not know what it means and I question whether anybody does, except perhaps legal historians." *In re Lake's Laundry, Inc.,* 79 F.2d 326, 328-29 (2d Cir. 1935) (dissenting opinion). Prior to the Uniform Commercial Code, the Uniform Sales Act accepted the common-law notion that title determination was the main solvent of sales problems. The U.C.C. deliberately deemphasizes this view. RSA 382-A:2-101, Uniform Law Comments. The code supplants many title-determined issues with specific code provisions to determine the rights and duties of the buyer and seller, such as risk of loss (RSA 382-A:2-509,-510), insurable interest (RSA 382-A:2-501), suit of third parties (RSA 382-A:2-722), buyer's rights on seller's insolvency (RSA 382-A:2-709), and buyer's right to replevy identified goods (RSA 382-A:2-716). Despite its minimization of the title concept, the code does recognize situations where the lack of any other legal tool requires the courts to fall back on the eternal title question of mine or thine. The code therefore provides a catch-basin rule (RSA 382-A:2-401) that applies only when the more specific code provisions fail to deal with the issue. The case before us was decided below with resort to this catch-basin rule, the pertinent portion of which reads as follows: "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. *Subject to these provisions* . . ., title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." RSA 382-A:2-401(1) (emphasis added).

The master correctly interpreted this provision to disallow in a sales situation the parties' intent to govern where title lay in a sales situation. Although the parties agree to reserve title in the seller after delivery of the goods to the buyer, the statutory language of "Subject to" clearly subjects the

parties' title agreement to the previous sentence's mandate that a seller may only retain a security interest after delivery to the buyer. *Providence Elec. Co., Inc.* v. *Sutton Place, Inc.*, 161 Conn. 242, 287 A.2d 379 (1971); *see* Annot., 17 A.L.R.3d 1010, 1081 (1968).

However, since RSA 382-A:2-401 speaks only in terms of buyers and sellers, we believe it does not apply to the transaction between these parties. RSA 382-A:2-103(1)(d) defines seller as "unless the context otherwise requires . . . (1)(d) 'Seller' means a person who sells or contracts to sell goods." A buyer is defined in RSA 382-A:2-103(1)(a) as "unless the context otherwise requires . . . (1)(a) 'Buyer' means a person who buys or contracts to buy goods." To determine the meaning of these sections, we refer to the definition of sale and contract for sale in RSA 382-A:2-106(1). "'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price. (See RSA 382-A:2-401)." For RSA 382-A:2-401(1) to apply, we must therefore first find that the transaction between the supplier, Shabry, and the manufacturer, Hargo, was a sale. *Columbia Int'l Corp.* v. *Kempler,* 46 Wis. 2d 550, 175 N.W.2d 465 (1970).

Whether this transaction was a sale or some other type of transaction is a question of the intent of the parties, which is a question for the trier of fact to determine. *Cf. Lebowitz* v. *McPike,* 151 Conn. 566, 201 A.2d 469 (1964). Under the code, there must still be a meeting of minds between the parties before there is a contract. *Euclid Eng'r Corp.* v. *Illinois Power Co.,* 79 Ill. App. 2d 145, 223 N.E.2d 409 (1967). The master found in the parties' requests for findings and rulings that the factual understanding between Hargo and Shabry contemplated no passage of title until Shabry was notified of Hargo's intention to use the goods and Shabry thereafter invoiced the goods to Hargo. The master also found that Hargo was never obligated to purchase and Shabry could have sold the goods to other buyers. Furthermore, the master specifically rejected the request for a finding of fact that Hargo's and Shabry's transaction constituted a sale of inventory to Hargo, and he also specifically found that the explicit agreement made between Shabry and Hargo contemplated no sale of goods until Hargo's election to buy and Shabry's invoicing of the goods.

Given these findings, it is clear that the parties' agreement concerning the delivered card waste created no contract for sale by the passage of title for a price. The parties showed no intent to pass title. No title may pass for a price without commitment of the buyer to pay the price. *See* Bender's U.C.C. Service; Duesenberg & King, Sales & Bulk Transfers, *s*. 13.03[4](d)(i) at 13-26 (1972). The mere fact that goods are delivered to the premises of a prospective buyer does not in and of itself create a sale, where neither party considered it a sale. *See First Am. Farms, Inc.* v. *Marden Mfg. Co.*, 255 So. 2d 536 (Fla. Dist. Ct. App. 1971), *cert. denied*, 261 So. 2d 845 (Fla. 1972).

The parties did agree as to the placement of the goods on Hargo's premises and Shabry did make an offer on the pro-forma invoice of a price if Hargo wished to buy. The parties' course of dealings in card waste helps us interpret the meaning of this agreement. RSA 382-A:1-205(1),-201(3). The record shows that Shabry's previous dealings with Hargo involved completed sales when the goods were delivered. When Shabry sent Hargo the contested card waste, Hargo, already possessing a card waste surplus, did not want to buy. Hargo, in accord with their prior course of dealing, intended to return the card waste; but Shabry, wishing to avoid the high cost of warehouse storage of card waste, offered to let Hargo retain possession of the goods and buy them only as Hargo had use for them at the price of the pro-forma invoice. Hargo accepted this storage offer and marked and stored Shabry's card waste independent of its other goods. This agreement contravened the old sale-on-delivery course of dealing between the parties and indicated this was a special new deal that did not purport to be a sale until further action by Hargo on Shabry's offer. Hargo was nothing more than a bailee with an option to buy if the goods were not sold to others. 8 Am. Jur. 2d Bailments *ss*. 22, 28, 29, 33, 43 (1963).

The performance of the parties also sheds light on their agreement. *Cf.* RSA 382-A:2-208(1). When Hargo needed eight bales of the card waste, he notified Shabry, who separately invoiced the eight bales to Hargo at the pro-forma invoice price, and Hargo thereafter paid for the goods. The clear notification and separate invoicing show that Shabry had not previously relinquished ownership of the bales to

Hargo. All that Shabry had relinquished was possession of goods for his own benefit to save storage costs and for the benefit of Hargo if it should need the goods. This course of performance also shows Shabry had made Hargo an offer at the pro-forma invoice price with specific instructions as to how Hargo could accept this offer. When Hargo decided to buy the eight bales they were invoiced as of that time instead of as of the date the twenty-four bales were stored with Hargo.

We find from the master's finding of the express terms of the parties' agreement, from the parties' course of dealing, and from the parties' course of performance, that the parties agreed only as to storage of the goods with Hargo for their mutual benefit. No sale was made until Shabry's offer was accepted by Hargo through notification of intent to use. No such acceptance occurred with respect to the sixteen bales at issue here.

The master assumed the parties transacted a sale when he held the issue of title to the sixteen bales of card waste rests on RSA 382-A:2-401. The master's findings of fact buttressed by the evidence in the record are inconsistent with his application of the law. Since the master's findings of fact are supported in the record, they are binding on appeal. *Brown* v. *Teel,* 108 N.H. 365, 236 A.2d 699 (1967); *Hines* v. *Donovan,* 101 N.H. 239, 139 A.2d 884 (1958); *Streeter* v. *New England Box Co.,* 106 N.H. 146, 207 A.2d 423 (1965).

We therefore hold that, since there was no sale, title to these goods cannot be determined by RSA 382-A:2-401 and, since no other provisions of the code apply, the rights of the parties are determined by the law of contracts. *See* RSA 382-A:2-102; RSA 382-A;1-103.

The master found the parties' stated intentions to be that title to these sixteen bales never passed to Hargo. We therefore hold that title remained in Shabry and that the receiver wrongfully withheld return of the sixteen bales to Shabry.

*Exceptions of Shabry Trading Co.*
*sustained; remanded.*

KENISON, C.J., did not sit; the others concurred.