**In the Matter of SAFFRON, INC., d/b/a Rutledge Fibre, Debtor.**

**SAFFRON, INC., Debtor in Possession, Plaintiff,**

v.

**MACON KRAFT, INC., Defendant.**

**Bankruptcy No. 91–52378.**
**Adv. No. 91–5110.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Dec. 4, 1991.

Ward Stone, Jr. and Edward N. Davis, Macon, Ga., for plaintiff.

Eugene S. Hatcher, Macon, Ga., for defendant.

Mark Roadarmel, Asst. U.S. Trustee, Macon, Ga., for U.S. Trustee.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

Saffron, Inc., Debtor, Plaintiff, filed its "Complaint to Set Aside Preference, for Declaratory Judgment and Seeking Temporary Retraining Order, Preliminary and Permanent Injunction Prohibiting Interference with Property" on September 6, 1991. Macon Kraft, Inc., Defendant, filed its answer on September 18, 1991. A trial was held on September 27, 1991. The Court, having considered the stipulation of facts, the evidence presented, and the arguments of counsel, now publishes this memorandum opinion.

Prior to 1991, Plaintiff was a broker for substandard paper. Plaintiff purchased substandard paper on open account from Defendant and sold the paper to third parties. In early 1991, Derek Hutchinson, Defendant's mill manager, told Jerry Rutledge, Plaintiff's president, that Defendant was "internalizing" the sale of substandard paper. Thus, Defendant now would sell its substandard paper directly to the ultimate user rather than to paper brokers such as Plaintiff.

Plaintiff decided to enter the coated paper business. In, or prior to, February 1991, Defendant orally agreed to produce for Plaintiff a certain grade of coated paper. The agreement was not reduced to writing. The paper was to be thirty-eight-

pound paper[1] with "clay in the top sheet." Plaintiff and Defendant refer to this paper as "liner board." This was high quality paper suitable for printing. The agreed price was $340 per ton, and Plaintiff contemplated using about 1,000 tons per month. Defendant normally produced forty-four-pound paper. Plaintiff wanted thirty-eight-pound paper, however, so that clay could be added to the top sheet for a smooth finish.

Defendant produced thirty-eight-pound paper only once each month. Defendant's general policy required that an original bill of lading and invoice be issued when paper was removed from its warehouse. Plaintiff did not need, nor could it pay for on normal credit terms, a month's supply of paper. Defendant was concerned that Plaintiff would not be able to pay for the paper. Defendant did not want to transfer title until Plaintiff paid for the paper.

Defendant agreed to produce a month's supply of thirty-eight-pound paper with clay in the top sheet and transfer it to a building owned by Plaintiff, which is known as the "Rutledge" warehouse. Plaintiff was to further process the paper and sell it to the ultimate user. Plaintiff agreed to notify Defendant, by facsimile, when it used a specified quantity of paper. Defendant then would issue an original bill of lading and invoice, triggering payment terms of "1%–10, net 30."

Plaintiff's building is a 25,000–square–foot open room. Plaintiff's manufacturing equipment is located on one side and its storage area is on the other side. This storage area was designated as the Rutledge warehouse. When Plaintiff was a paper broker, Defendant sometimes rented warehouse space from Plaintiff and stored paper there. This practice was discontinued before Plaintiff entered the coated paper business.

The production agreement between Plaintiff and Defendant never became fully operational. On two or more occasions, Defendant sent Plaintiff several rolls of paper. These rolls were defective, and Defendant instructed Plaintiff to sell the paper at a discount. Defendant may have picked up some of the rolls. These rolls are not at issue in the case at bar.

In February 1991, Plaintiff owed Defendant more than $200,000. This debt was for substandard paper that Plaintiff had purchased before it entered the coated paper business. On April 3, 1991, Plaintiff's president signed a security agreement and financing statement in favor of Defendant to secure payment of this debt. Plaintiff's president signed a promissory note in favor of Defendant on the same date for $232,-424.52. Defendant filed the financing statement for record on April 15, 1991. This recording perfected Defendant's lien in certain personal property owned by Plaintiff.

On or before April 8, 1991, Plaintiff placed an order for 101 tons of paper. Defendant produced and sent thirty-two rolls of paper to the Rutledge warehouse on or about April 8, 1991. On April 18, 1991, Plaintiff notified Defendant by facsimile that five rolls had been used. On April 19, 1991, Defendant generated an original bill of lading and invoice for the five rolls, with payment terms of "1% net 30." The bill of lading showed that the rolls were "Consigned to Saffron–Rutledge." The invoice showed "Ship To: Saffron–Rutledge" and "Sold To: Saffron–Rutledge."

Plaintiff filed a petition under Chapter 11 of the Bankruptcy Code on July 12, 1991. At that time, Plaintiff was in possession of the remaining twenty-seven rolls. Each roll weighed between 5,068 and 7,400 pounds. On advice of its bankruptcy counsel, Plaintiff sold twenty-four rolls postpetition. The proceeds in the amount of $17,-248.20 have been deposited into the registry of the Court. Plaintiff continues to hold the remaining three rolls.

Attached to each of the twenty-seven rolls was a label containing the following information:

1. One thousand square feet of this paper weighs thirty-eight pounds.

Customer Name and Destination: Saffron-Rutledge, Macon, GA 31211

Grade: 38L 38 # LIN

Date: 4/08/91

Order: 5967

Customer P.O. Number: 4000

Core Size: 4 inch

Diameter: 58 inch

Roll Number: (Various roll numbers)

Roll Width: (Various roll widths)

Linear Measure: (varied between 24,408 and 25,953 feet)

Weight: (varied between 5,068 and 7,400 pounds)

Plaintiff and Defendant did not sign any written agreements, security agreements, or UCC financing statements on the twenty-seven rolls.

## CONCLUSIONS OF LAW

Plaintiff contends that it owned the twenty-seven rolls of paper. Plaintiff contends that the remaining three rolls and the proceeds from the sale of the twenty-four rolls are property of its bankruptcy estate.[2] Defendant contends that ownership of the twenty-seven rolls never passed to Plaintiff. Thus, Defendant contends that the remaining three rolls and the proceeds are not part of the bankruptcy estate.

Section 11-2-401(1) and (2) of the Georgia Code[3] provides, in part:

Each provision of this article with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Code Section 11-2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on secured transactions (Article 9 of this title), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading:

(a) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) If the contract requires delivery at destination, title passes on tender there.

O.C.G.A. § 11-2-401(1) and (2) (1982).

"A 'sale' consists in the passing of title from the seller to the buyer for a price (Code Section 11-2-401)." O.C.G.A. § 11-2-106(1) (1982).

A "buyer" is a person who buys or contracts to buy goods. A "seller" is a person who sells or contracts to sell goods. O.C.G.A. § 11-2-103(1)(a) and (d) (1982).

Section 11-2-501(1)(b) of the Georgia Code[4] provides:

(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or

---

**2.** *See* 11 U.S.C.A. § 541(a) (West 1979 & Supp. 1991).

**3.** O.C.G.A. § 11-2-401(1) and (2) (1982).

**4.** O.C.G.A. § 11-2-501(1)(b) (1982).

reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. *In the absence of explicit agreement identification occurs:*

. . . .

(b) If the contract is for the sale of future goods other than those described in paragraph (c) of this subsection, when goods are shipped, marked, or otherwise designated by the seller as goods to which the contract refers;

O.C.G.A. § 11–2–501(1)(b) (1982) (emphasis added).

In *Elliott v. State*,[5] the Georgia Court of Appeals stated:

[The merchants/sellers] testified that, in their opinion, each transaction was "cash and carry," though it is clear that they extended credit to the appellant at least until the date on which he agreed to return with the purchase price. Apparently, by "cash and carry" the [merchants] sought to show that while they allowed the appellant to "carry" the merchandise away, they did not intend to divest themselves of ownership until they received the "cash." However, what parties subjectively intend by their actions cannot take precedence over what the law determines to be the legal effect thereof.

Under Georgia law, a "sale" consists in the passing of title from the seller to the buyer for a price. Code Ann. § 109A–2–106(1). Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods. Code Ann. § 109A–2–401. The evidence here shows that the appellant offered to pay in the future for goods to be delivered in the present. The seller agreed, delivered the merchandise to the appellant, and did not retain any security interest therein. Thus, there was a completed "sale" of the goods in question, and the appellant had not only rightful possession of the items, but title to them as well. The sole

"interest" that the merchants had in the goods was a right to future payment pursuant to the sales contract.

254 S.E.2d at 901.

Defendant agreed to produce a certain grade of coated paper for Plaintiff. This paper, although not unique, was not the kind that Defendant normally produced. The paper was delivered to the Rutledge warehouse, the same location as Plaintiff's storage area and manufacturing operation. Plaintiff had control over the paper and could use it whenever needed. Defendant presented no evidence that it could have removed the paper from the warehouse and sold it to other buyers. The labels on the twenty-seven rolls clearly identify and distinguish them from other rolls of paper. Defendant agreed to generate a bill of lading and invoice only after Plaintiff actually used the paper. This arrangement was simply a creative credit accommodation.

Defendant relies on the case of *Meinhard–Commercial Corp. v. Hargo Woolen Mills*[6] from the Supreme Court of New Hampshire. The manufacturer sent Hargo goods that Hargo did not want to buy. Hargo intended to return the goods. The manufacturer, wanting to avoid warehouse storage cost, let Hargo keep the goods and invoiced them as Hargo used the goods. Hargo was never obligated to buy the goods. The manufacturer could have sold the goods to other buyers. The court stated:

Whether this transaction was a sale or some other type of transaction is a question of the intent of the parties, which is a question for the trier of fact to determine. Under the code, there must still be a meeting of minds between the parties before there is a contract.

300 A.2d at 324.

The Court is persuaded that the *Meinhard–Commercial Corp.* case is distinguishable from the case at bar. Plaintiff ordered, and Defendant specifically manufactured and sent to Plaintiff, thirty-two rolls of paper. Plaintiff and Defendant had previously agreed on the characteris-

**5.** 149 Ga.App. 579, 254 S.E.2d 900 (1979).

**6.** 112 N.H. 500, 300 A.2d 321 (1972).

tics, quality, price, and credit terms for this paper. The only undetermined factor was the exact date that Plaintiff would use the paper. Defendant, of course, certainly understood that it would be used in the very near future. Defendant did not send the paper speculating that Plaintiff might want to buy it.

The Court is persuaded that Defendant sold to Plaintiff the twenty-seven rolls of paper[7] before Plaintiff filed its bankruptcy petition. Thus, the twenty-seven rolls were property of the bankruptcy estate. Defendant did not perfect a security interest in the rolls. Plaintiff, therefore, is entitled to the three remaining rolls and the proceeds of $17,248.20.

■ The Court now turns to the question of whether Plaintiff may avoid the security agreement executed April 3, 1991, which gave Defendant a security interest in certain personal property. Defendant admits that all elements for an avoidable preference under section 547(b) of the Bankruptcy Code[8] have been met. Defendant contends that it gave "new value" after the security interest was perfected. Section 547(a)(2) of the Bankruptcy Code[9] defines "new value" as follows:

(a) In this section—

. . . .

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

11 U.S.C.A. § 547(a)(2) (West Supp.1991).

Section 547(c)(4) of the Bankruptcy Code[10] provides, in part:

(c) The trustee may not avoid under this section a transfer—

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C.A. § 547(c)(4) (West 1979).

Defendant has the burden of proving the nonavoidability of a transfer under section 547(c). 11 U.S.C.A. § 547(g) (West Supp. 1991).

Section 547(c)(4) allows a creditor to retain an otherwise avoidable transfer to the extent that the creditor extended new value to the debtor after the preferential transfer. *Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*, 38 B.R. 829, 837 (Bankr.M.D.Ga.1984).

In *Charisma Investment Co., N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*,[11] the Eleventh Circuit Court of Appeals considered the "subsequent advance" exception of section 547(c)(4). The circuit court stated:

A subsequent advance is excepted because it is reasoned that a creditor who contributes new value in return for payments from the incipient bankrupt, should not later be deemed to have depleted the bankruptcy estate to the disadvantage of other creditors.... [Section 547(c)(4)] has generally been read to require: (1) that the creditor must have extended the new value after receiving the challenged payments, (2) that the new value must have been unsecured, and (3) that the new value must remain unpaid.

. . . .

In applying this definition of new value [found in section 547(a)(2)] to the subse-

---

**7.** Five of the thirty-two rolls were invoiced before the bankruptcy petition was filed. Title to these rolls is not in question.

**8.** 11 U.S.C.A. § 547(b) (West 1979 & Supp.1991).

**9.** 11 U.S.C.A. § 547(a)(2) (West Supp.1991).

**10.** 11 U.S.C.A. § 547(c)(4) (West 1979 & Supp. 1991).

**11.** 841 F.2d 1082 (11th Cir.1988).

quent advance exception, courts have consistently looked to the principal policy objectives underlying the preference provisions of the Bankruptcy Code. The first objective is to encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse. Another related objective of this section is to promote equality of treatment among creditors. The subsequent advance exception promotes these general policy objectives "because its utility is limited to the extent to which the estate was enhanced by the creditor's subsequent advances during the preference period."

Thus, courts have generally required a transfer which fits within the subsequent advance exception to provide the debtor with a material benefit. This focus upon whether a material benefit has been conferred has been explained in terms of insulating a preferential transfer to a particular creditor to the extent that that creditor thereafter replenishes the estate. In such a situation, the creditor pool would not be harmed to the extent of the offset and the fundamental goal of equality of distribution would be preserved.

841 F.2d at 1083–84.

■ On April 3, 1991, Plaintiff's president signed a security agreement and financing statement in favor of Defendant to secure a debt of $232,424.52. Defendant filed the financing statement for record on April 15, 1991. This recording perfected Defendant's lien in certain personal property owned by Plaintiff. April 13 and 14, 1991, were a Saturday and a Sunday. Under Bankruptcy Rule 9006(a) [12] and section 547(e)(2)(A) and (e)(3) of the Bankruptcy Code,[13] Defendant's security interest in Plaintiff's personal property is deemed to have been perfected on April 3, 1991. Defendant sold to Plaintiff thirty-two rolls of paper on credit on April 8, 1991. Thus, Defendant extended new value after it received the avoidable preference. The Court is persuaded that Plaintiff cannot avoid Defendant's security interest to the extent of the value of the thirty-two rolls of paper. The value of the thirty-two rolls is the total amount that Defendant would have invoiced Plaintiff for the thirty-two rolls. Thus, Defendant is entitled to retain the lien that arises out of the April 3, 1991, security agreement, but only to the extent of the invoiced amount of the thirty-two rolls.

An order in accordance with this memorandum opinion will be entered this date.

### ORDER

In accordance with the memorandum opinion entered this date; it is

ORDERED that the lien of Macon Kraft, Inc., Defendant, in certain personal property of Saffron, Inc., Plaintiff, arising out of the security agreement dated April 3, 1991, is hereby set aside except to the value of the thirty-two rolls of paper transferred by Defendant to Plaintiff, which are hereby determined to be new value under section

---

12. Fed.R.Bankr.P. 9006(a). This rule provides, in part:

(a) **Computation**
In computing any period of time prescribed or allowed by these rules, by the local rules, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

13. 11 U.S.C.A. § 547(e)(2)(A) and (e)(3) (West 1979). This section provides:
(2) For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—
(A) at the time such transfer takes effect between the transferror and the transferee, if such transfer is perfected at, or within 10 days after, such time;
. . . .
(3) For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

547(c)(4) of the Bankruptcy Code;[1] and it is further

ORDERED that it is hereby determined that the twenty-seven rolls of paper at issue in this adversary proceeding were property of Plaintiff's bankruptcy estate when Plaintiff's bankruptcy case was filed; and it is further

ORDERED that the sum of $17,248.20 held in the registry of this Court is hereby determined to be an asset of Plaintiff's bankruptcy estate.

SO ORDERED.

1. 11 U.S.C.A. § 547(c)(4) (West 1979 & Supp. 1991).