**In re ALCOM AMERICA
CORPORATION,
Debtor.**

**Bankruptcy No. 84–00138.**

United States Bankruptcy Court,
District of Columbia.

April 14, 1993.

Stephen B. Sale, Washington, DC, for debtor.

Harvey M. Katz, Washington, DC, for trustee.

Leslie M. Alden, McLean, VA, for Arab Banking Corp.

## DECISION PROVISIONALLY GRANTING ARAB BANKING CORPORATION SUMMARY JUDGMENT AGAINST THE TRUSTEE AND THE DEBTOR

S. MARTIN TEEL, Jr., Bankruptcy Judge.

Under consideration is a motion for summary judgment filed by the trustee, Daniel E. Leach, against Arab Banking Corporation ("ABC" or "the bank"). The trustee has moved for the imposition of sanctions for contempt against ABC for violating the automatic stay. In support of the contempt motion, the trustee alleges that after repossessing certain ethanol owned by the debtor, ABC violated the stay by completing the sale of that ethanol to A.E. Staley Manufacturing Company ("A.E. Staley" or "Staley"). The debtor, Alcom America

Corporation, has intervened and supports the trustee in his motion. ABC opposes the trustee's motion averring that at the time of sale the debtor had no interest in the ethanol.

The court agrees with the bank's position as the undisputed facts indicate title to the ethanol had passed to Staley before the petition was filed. Because the court believes that there are no genuine issues of material fact and that ABC is entitled to judgment as a matter of law, it is inclined to grant summary judgment in favor of ABC. However, the bank has not cross-moved for summary judgment. Therefore, the trustee and the debtor will be given the opportunity to submit any evidence demonstrating the existence of a genuine issue of material fact.

### FACTS

#### I. *Facts Underlying Controversy*

This contested matter had its genesis in a transaction involving the debtor, ABC, and the Fondo de Ordenacion y Regulacion de Producciones y Precios Agrarios ("FORPPA"), an agency of the Spanish government. In June 1983 the debtor contracted with FORPPA for the purchase of ethanol. Shortly after that, the debtor established commitments from Johann Haltermann, Ltd. ("Haltermann") for the processing of the ethanol and from A.E. Staley for the purchase of some of the ethanol.

In a facility letter entered into in August 1983 the debtor received a commitment from ABC for financing of $3 million. In exchange the debtor executed promissory notes in favor of ABC. As security for the loan the debtor and ABC executed two security agreements, one in August 1983 and the other in September 1983. The security agreements were nearly identical, and both gave ABC "a security interest in all [the debtor's] right, title and interest in the following contracts (and all proceeds therof [sic])." Among the contracts listed in the security agreements was the debtor's contract with FORPPA. ABC filed financing statements in New York covering each security interest.

Between September and December 1983, ethanol was shipped to Houston, Texas and stored in terminals there. As the ethanol was stored, the warehousemen issued non-negotiable warehouse receipts. These receipts were eventually endorsed by Joseph O. Jacobson, at that time an officer of the debtor, and turned over to ABC.

On December 31, 1983, Chemtank, one of the warehousemen, released roughly 270,000 gallons to Barge GBL–101 for processing by Haltermann. Of the 270,000 gallons, almost 147,000 gallons were sold to A.E. Staley well before the debtor's petition was filed on March 16, 1984, and are not implicated here. The remaining 122,000 gallons (after some loss from evaporation) form the heart of the instant dispute.

The debtor and ABC executed a new security agreement on January 9, 1984. This security agreement gave ABC a security interest in just about all of the debtor's personal property including inventory. A few days later, ABC filed a financing statement in New York covering this security interest.

From the outset of this transaction the debtor had experienced difficulties in fulfilling its obligations to ABC, and on January 19, 1984, ABC sent the debtor a telex indicating that the debtor had defaulted under the January 9, 1984 security agreement and that the bank was enforcing its security interest under the Uniform Commercial Code ("UCC").

On January 19, 1984, ABC also notified the warehousemen that it held a warehouse receipt covering the ethanol in storage and that it was enforcing its right to dispose of that ethanol. ABC further instructed the warehousemen to issue negotiable warehouse receipts in the name of ABC. In the next two weeks, ABC received negotiable warehouse receipts from the warehousemen.

One day later, on January 20, 1984, ABC sent Haltermann similar notification. Haltermann quickly responded by telex dated January 25, 1984. That telex informed ABC that Haltermann held the 122,000 gallons currently in dispute, that the debtor

was in default, and that ABC had only two days—until January 27, 1984—to remove the ethanol or it would be confiscated.

One week after sending the first notice of default, ABC sent the debtor another notice of default. This notice, dated January 27, 1984, was to the same effect as the earlier one, declaring the debtor in default and indicating ABC's intent to pursue its remedies under the UCC. However, this time ABC stated it was acting under the security agreement executed in September 1983 (as opposed to the January 9, 1984 security agreement).

In a telex to Haltermann dated February 9, 1984, ABC indicated its acceptance of Haltermann's proposal to process the ethanol. One day later, on February 10, 1984, ABC received a telex from A.E. Staley by which Staley accepted ABC's offer to sell the 122,000 gallons of ethanol presently at issue. The debtor has produced a telex from Staley directed to the attention of Jacobson identical to the telex sent to ABC.

In a letter dated March 8, 1984, ABC informed the debtor it had received an offer of $.57 a gallon for the roughly 7.4 million gallons of ethanol stored in Houston. ABC stated its intention to accept that offer unless the debtor came up with a better deal by March 16, 1984.

On March 9, 1984, Haltermann completed processing the 122,000 gallons of ethanol, which had been reduced to 110,000 gallons during processing, and released them to a carrier for shipment to A.E. Staley. The loading of the ethanol was closely monitored by an independent surveyor who measured how much ethanol was loaded and performed various tests on the ethanol. When the loading was completed, the carrier issued a bill of lading covering the ethanol.

ABC sent A.E. Staley an invoice on Alcom letterhead, dated March 16, 1984, requesting payment of $146,738.43 for the ethanol. On March 16, 1984, the debtor filed a voluntary petition for relief under chapter 7. According to the debtor, it notified ABC of the filing on that same day. ABC claims it did not receive notice until three days later, on March 19, 1984. ABC received payment of $145,590.93 from A.E. Staley sometime around March 23, 1984.

## II. *Procedural History*

On April 13, 1984, the trustee moved for an order permitting sale of the remaining ethanol, totalling about 7.0 million gallons, free and clear of all liens and encumbrances. The motion indicated that ABC claimed a lien on the ethanol for roughly $8.4 million, but that the trustee believed the liens may be avoidable under 11 U.S.C. § 545. (The trustee probably cited § 545 by mistake since 11 U.S.C. § 544 seems to be the more relevant statute.)

A few days later, on April 17, 1984, ABC moved for an order to show cause why ABC should not be granted relief from the automatic stay to sell the remaining ethanol. The court elected to treat this motion as a motion for relief from the automatic stay. In an objection, the trustee indicated ABC's liens may be avoidable under § 545 and § 547 of the Code.

Hearings on the two motions were consolidated, and a single hearing was held on April 30, 1984. On that day, the court entered an order granting the trustee's motion and denying ABC's motion. In reaching its decision, the court noted that "the lien of ABC, if valid, will attach to the proceeds" of the sale and that "[t]here has been no showing by ABC of a valid security interest in the [ethanol]."

ABC submitted a motion for clarification and amendment of the court's order. In opposing this motion, the trustee indicated he had taken no position on the validity of ABC's lien. In denying ABC's motion, the court held that the previous order specifically provided "that valid liens, if any, of ABC attached to the proceeds of the sale."

On October 29, 1984, the trustee filed a motion for compromise of claim and interest of ABC. Attached to the motion was a copy of the settlement document. Both the motion and the settlement document recite that compromise is in the best interests of the estate. According to these documents, compromise was preferable since it allowed both parties to avoid incurring the ex-

penses necessary to determine the validity of ABC's claimed lien on the proceeds from the sale of the ethanol.

On November 28, 1984, the court entered an order granting the motion to compromise, and any questions as to the validity of ABC's lien were seemingly at an end. However, this changed almost five-and-a-half years later, in April 1990, when at the behest of the debtor, the trustee made application to undertake an investigation into certain aspects of ABC's conduct. The court approved the application in June 1990.

The investigation culminated in the trustee filing a motion in August 1991 to abandon all the claims against ABC with the exception of any claims arising from the March 1984 sale of ethanol to A.E. Staley. The court granted this motion in October 1991.

On December 13, 1991, the trustee filed a motion for sanctions against ABC alleging that ABC sold the ethanol and received the proceeds of $145,590.93 after the petition was filed. According to the trustee, this act was in violation of the automatic stay. The trustee further averred that the violation was willful in that ABC attempted to conceal its act. Therefore, the trustee sought a contempt order and the award of sanctions of $145,590.93 plus interest and attorney's fees. The debtor filed a memorandum in support of the trustee's motion for sanctions, which the court decided to treat as a complaint-in-intervention.

On June 15, 1992, the trustee filed a motion for summary judgment against ABC and against the debtor on the complaint-in-intervention to the extent it alleged new violations of the automatic stay. In its reply the debtor supported the trustee in his motion against ABC but opposed the trustee in his motion against the debtor.

On July 29, 1992, the debtor filed a motion to amend its complaint-in-intervention by adding three counts. The court granted this motion on August 14, 1992, because unopposed as of that date.

On August 18, 1992, ABC filed an opposition to the trustee's motion for summary judgment against the bank and supported the trustee in his motion against the debtor. On that date, ABC also filed an opposition to the debtor's motion to amend its complaint-in-intervention, asserting that the amendments were beyond the scope of the intervention previously allowed. According to ABC, that scope was limited to any claims arising from the sale of ethanol in March 1984.

On August 24, 1992, ABC filed a motion to reconsider the court's previous order allowing the debtor to amend its complaint-in-intervention, and the debtor filed an opposition to the motion for reconsideration. The court granted the motion to reconsider, vacated its order allowing amendment, and denied the motion to amend the complaint-in-intervention. The court held that the pursuit of any claims not arising from the March 1984 ethanol sale was foreclosed by the court's October 21, 1991 order that all such claims be abandoned.

As a result of the order denying amendment of the complaint-in-intervention, this case has proceeded solely on the trustee's motion for summary judgment against ABC. Since then, the debtor appears to have abandoned any additional claims asserted in the complaint-in-intervention. To the extent any such claim may not have been abandoned, the court will grant the trustee summary judgment against the debtor on that claim.

This matter is presently ready for review. The only issues before the court arise out of the March 1984 sale of the 122,000 gallons of ethanol to A.E. Staley. With respect to these issues, both the trustee and debtor broadly argue that ABC's actions after the filing of the petition violated the automatic stay. The thrust of their argument seems to be that the ethanol was property of the estate when the petition was filed, and that ABC improperly took action after the petition date to enforce its lien and to dispossess the estate of the ethanol. ABC asserts the contrary. It contends the debtor had been completely divested of any rights in the ethanol well before the filing of the petition. The trustee further maintains that irrespective of

the status of the ethanol, ABC's acts after the petition date violated the automatic stay.

### SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), made applicable in these proceedings by Fed.R.Bankr.P. 9014 and 7056, summary judgment is appropriate only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Moreover, "[trial courts] are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

A review of ABC's filings in this case reveals that it never cross-moved for summary judgment against the trustee. However, the court does not view this as an impediment to summary judgment in favor of the bank. Both the trustee and the debtor were on notice that ABC challenged the existence of an essential element of their case—that is, that the ethanol was property of the estate on the petition date. In so challenging, ABC did not take the position that factual disputes precluded summary judgment, but rather contended on undisputed facts that the ethanol was not property of the estate on the petition date. The very nature of ABC's challenge to the element's existence provided the required notice. In addition, in the various status hearings held since the trustee filed his motion for summary judgment, the parties and the court have treated this case as though it were ready for review on cross-motions for summary judgment. In short, both the trustee and the debtor were on notice to come forward with all their evidence. Therefore, the court is inclined to treat ABC's oppositions to summary judgment as amounting to a cross-motion for summary judgment.

As is discussed below, the court believes ABC to have demonstrated it is entitled to the entry of summary judgment in its favor. Nonetheless, out of an abundance of caution, the court will allow the trustee and the debtor 10 days from the date of entry of this decision in which to submit any evidence demonstrating the existence of a genuine issue of material fact. This 10-day time frame is consistent with the notice period set forth in Fed.R.Civ.P. 56(c), which applies when a court wants to grant summary judgment sua sponte. *See NL Indus., Inc. v. GHR Energy Corp.*, 940 F.2d 957, 965 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). Absent the submission of additional evidence within 10 days of entry of this order, the court will enter a separate order granting ABC summary judgment pursuant to this decision.

### DISCUSSION

This case turns on whether the debtor had any legal or equitable interest in the ethanol on the petition date. Such an interest would constitute property of the estate under 11 U.S.C. § 541. If the debtor did have an interest in the ethanol, the automatic stay found in § 362 applied and was violated by ABC's post-petition conduct. *See* 11 U.S.C. §§ 362(a)(3)–(4). Conversely, a finding that the debtor lacked any interest in the ethanol on the petition date means that § 362(a)(6) is the only automatic stay provision arguably applicable to this matter. Whether that provision applies is discussed at the end of this opinion.

 Any interest the debtor has in property, no matter how insignificant, constitutes property of the estate, 11 U.S.C. § 541(a)(1); *United States v. Whiting Pools*, 462 U.S. 198, 204–05 & n. 9, 103 S.Ct. 2309, 2313–14 & n. 9, 76 L.Ed.2d 515 (1983), and renders the automatic stay applicable to bar creditor acts against that interest, 11 U.S.C. § 362(a)(3)–(4); *see In re Bialac*, 712 F.2d 426, 431–32 (9th Cir.1983); *In re Spencer*, 115 B.R. 471, 476 (D.Del. 1990); *In re De Souza*, 135 B.R. 793, 795– 96 (Bankr.D.Md.1991); *In re Liggett*, 118 B.R. 213, 216 (Bankr.E.D.N.Y.1990). It is only when the debtor is stripped of all rights in the property that the automatic stay no longer applies to acts against the property. *See In re Mann*, 907 F.2d 923,

**104**

927 (9th Cir.1990); *Bialac*, 712 F.2d at 431–32; *see, e.g., Liggett*, 118 B.R. 213.

■ The nature and extent of a debtor's interest in property is determined by applicable non-bankruptcy law. *In re Prudential Lines, Inc.*, 928 F.2d 565, 569 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991). In this case that law is state law. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Because the instant transactions were governed by the UCC, the applicable state law is the UCC. *In re Yale Express System, Inc.*, 370 F.2d 433, 437 (2d Cir.1966); *In re United Thrift Stores, Inc.*, 363 F.2d 11, 14 (3rd Cir.1966).

The two main issues that arise under state law are whether ABC had a valid security interest in the ethanol and whether the debtor had any interest in the ethanol on the date the petition was filed. These issues and various collateral issues are dealt with below.

**I. Did ABC have a valid security interest in the ethanol?**

**A. Which state's law controls?**

As a preliminary matter the court must decide which state's law controls. However, as a general rule, where the relevant UCC provisions are identical in all material respects, as they are here, the controlling law should be the same in each state.[1] 1 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 1–105(8) (1985) [hereinafter *Anderson on the Uniform Commercial Code*]; *e.g., Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1163 (6th Cir.1972). When UCC provisions are the same, state law will vary only where courts have interpreted those provi-

sions differently. 1 *Anderson on the Uniform Commercial Code* § 1–105(8).

■ Although the debtor was domiciled in the District of Columbia, the security agreements provide that New York law governs. Under the UCC, except as provided in UCC § 1–105(2), the parties' intent controls as long as their "transaction bears a reasonable relation to [New York]." UCC § 1–105(1).[2] This test is met where the secured party is located in the state whose law by agreement governs. *E.g., Citi–Lease Co. v. Entertainment Family Style, Inc.*, 825 F.2d 1497, 1499 (11th Cir. 1987); *Pennsylvania House, Inc. v. Juneau's Pennsylvania House*, 782 F.Supp. 1195, 1196 (E.D.Tex.1991). Thus, New York law will control where it differs materially from District of Columbia law. Nonetheless, in light of the UCC's goal of uniformity, other state court decisions are highly relevant. *In re Hispanic American Television Co.*, 113 B.R. 453, 456–57 (Bankr.N.D.Ill.1990).

**B. UCC Article 7 Issues**

For the reasons set forth below, the court concludes that Article 7 of the UCC provides no basis for according ABC an ownership interest in the ethanol. The court further determines that whether a security interest attached to the ethanol pursuant to the transfer of warehouse receipts cannot be resolved at the summary judgment stage.

The court requested that the parties brief the effect of the debtor's transfer of nonnegotiable warehouse receipts to ABC and the later issuance of negotiable warehouse receipts to ABC. The trustee and the debtor urged that, at most, either

**1.** Because the relevant provisions are identical in all material respects, the court will cite only to the "UCC." The relevant sections of the UCC can be found in title 28 of the District of Columbia Code Annotated or in Book 62½ of McKinney's Consolidated Laws of New York Annotated as well as the most recent edition of the *Uniform Commercial Code* in the Uniform Laws Annotated series.

**2.** Under UCC § 1–105(2), the question of perfection would still be governed by District of Columbia law. But the question of perfection is

irrelevant in this case. As long as a security interest existed and had attached, it was enforceable as between the debtor and ABC. *See* UCC § 9–203(1)–(2); 9 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 9–301:15 (1985); *see, e.g., First Nat'l Bank of Amarillo v. Southwestern Livestock, Inc.*, 859 F.2d 847, 852 (10th Cir.1988). The lack of perfection would be relevant only if the trustee attempted to avoid the security interest, and it is too late for that now. 11 U.S.C. § 546(a)(1).

transaction created only a security interest. ABC insisted that either transaction vested title to the ethanol in the bank.

1. *Negotiable Warehouse Receipts*

Questions of the authority of Jacobson aside, the issuance of the negotiable warehouse receipts in late January 1984 did not transfer title to ABC. At that time, the records of the warehouseman, Chemtank, indicate that it had already released the ethanol at issue to Haltermann for processing. Thus, the warehouse receipt issued by Chemtank did not cover the 122,000 gallons of ethanol and could not have vested ABC with any interest in that ethanol.

2. *Nonnegotiable Warehouse Receipts*

■ The transfer of the nonnegotiable warehouse receipts Jacobson endorsed to ABC created only a security interest in favor of ABC. In this respect, the parties' intent controls whether the transfer vested ownership in the transferee or only created a security interest. *A/S Dampskibsselskabet Torm v. Beaumont Oil Ltd.*, 927 F.2d 713, 720 (2d Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 183, 116 L.Ed.2d 144 (1991); *American Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1143–45 (9th Cir.1981); *Scallop Petroleum Co. v. Banque Trad-Credit Lyonnais S.A.*, 690 F.Supp. 184, 190 (S.D.N.Y.1988); *see In re Golden Plan of California, Inc.*, 829 F.2d 705, 709 (9th Cir.1986).

There is no evidence that the parties' intent was other than to create a security interest. In particular, ABC has adduced no proof that the debtor intended to give ABC ownership of the ethanol. Instead, the events surrounding the transfer indicate it was for purposes of security only. *See, e.g., Beaumont Oil*, 927 F.2d at 720; *American Triticale*, 664 F.2d at 1145; *Scallop Petroleum*, 690 F.Supp. at 190. Absent any proof of intent to transfer ownership, the court concludes the parties attempted to create a security interest.

■ At this point, any attempt to assess whether ABC had an enforceable security interest in the ethanol would require the resolution of numerous difficult factual and legal issues. These issues arise because possession of nonnegotiable warehouse receipts in itself does not give rise to an enforceable security interest in the goods covered by the receipts. *See* UCC § 9–304 cmt. 3; 2 J. White & R. Summers, *Uniform Commercial Code* § 21–5, at 167 (1988). Instead, any security interest created by transfer of the warehouse receipts is enforceable (and also perfected under UCC § 9–304(3) and § 9–305) only on attachment of the security interest which, in the absence of a written security agreement, requires the secured party to take possession of the goods pursuant to agreement between the parties. UCC §§ 9–203(1)(a), (2); *Transport Equipment Co. v. Guaranty State Bank*, 518 F.2d 377, 382 (10th Cir.1975); *Hodges v. First Nat'l Bank of South Carolina*, 35 U.C.C.Rep. Serv. (Callaghan) 1289, 1292 (4th Cir.1982) [696 F.2d 990 (table)] (unpublished opinion).

When the goods are in the possession of a bailee, such as the warehouseman here, determining whether the secured party possessed the goods is a difficult question. Such an inquiry would necessarily involve determining whether the parties intended the transfer of the nonnegotiable warehouse receipts to give ABC the right to possess the ethanol (since there is no written agreement to that effect), UCC § 9–203(1)(a); whether the warehouseman was under the control of the debtor, *see In re Copeland*, 531 F.2d 1195, 1203–04 (3rd Cir. 1976); UCC §§ 9–304(3), 9–305 & cmt. 2; and whether the warehouseman received notice of ABC's interest in the ethanol, *Hodges*, 35 U.C.C.Rep.Serv. at 1292–93.

Because the warehouseman released the ethanol to Haltermann, it would have to be further determined whether that release caused any security interest to lapse, 8 *Anderson on the Commercial Code* § 9–203:42; *In re Raiton*, 139 B.R. 931, 937 (9th Cir. BAP1992), and, if so, whether ABC's notice to Haltermann of Alcom's default and of its exercise of control over the ethanol was sufficient to reinstate the security interest or create a new one, *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1233 (7th Cir.1990); *Transport Equipment Co. v. Guaranty State Bank*,

518 F.2d 377, 382 (10th Cir.1975). Because the court finds the existence of a valid security interest on other grounds, it need not address these difficult issues.

### C. *August and September 1983 Security Agreements*

The security agreements entered into in August and September 1983 created a security interest in favor of ABC in all the debtor's rights under the contract with FORPPA and all proceeds of those rights. The security agreements specifically reference the FORPPA contract and explicitly include proceeds of the debtor's contract rights. All the requirements of UCC § 9–203(1) for the security interest to attach were met.

1. *The security interest reached the general intangibles consisting of the debtor's rights under the FORPPA contract.*

■ Under the UCC, contract rights generally consist of any inchoate rights to payment under a contract. *See In re SRJ Enterprises, Inc.*, 150 B.R. 933 (Bankr. N.D.Ill.1993). However, contract rights also include rights under a contract unrelated to the payment of money. Such contract rights constitute "general intangibles" within the meaning of UCC § 9–106. *In re Wilson*, 86 B.R. 871, 875–76 (W.D.Va. 1988), *rev'd on other grounds*, 867 F.2d 203 (4th Cir.1989); *In re Scheidmantel Olds–Cadillac, Inc.*, 144 B.R. 296, 297–98 (Bankr.W.D.Pa.1992); *Dynair Elec., Inc. v. Video Cable, Inc.*, 55 Cal.App.3d 11, 127 Cal.Rptr. 268, 272–73 (1976); *see also* UCC § 9–106 cmt. (general intangibles include miscellaneous contract rights). *But see In re SRJ Enterprises, Inc.*, *supra* (drawing a distinction between "contract rights" and "contractual rights"). Here, the debtor's rights under the FORPPA contract did not consist of inchoate rights to payment, but of rights to obtain ethanol from FORPPA. Thus, ABC's security interest is properly regarded as existing in certain of the debtor's "general intangibles."

■ The failure to include the term of art "general intangibles" in the security agreements is not fatal to finding a valid security interest in favor of ABC in the debtor's rights under the FORPPA contract. The security agreements specifically referenced and described the FORPPA contract and indicated the parties' intent to give ABC a security interest in the debtor's rights under that contract. *See Scheidmantel Olds–Cadillac*, 144 B.R. at 298–99. Since the only rights the debtor had under the FORPPA contract were rights to obtain ethanol from FORPPA, the security agreements should be read to include those contract rights. A contrary interpretation would render the relevant provisions in the security agreements a nullity. This would frustrate the intent of the parties who would not have included the provisions at all if they desired such a result. Accordingly, the court finds that ABC had a valid security interest in certain of the debtor's general intangibles consisting of the debtor's rights under the FORPPA contract.

### 2. *The ethanol was proceeds of the FORPPA contract rights.*

■ The real issue here is whether the ethanol obtained by the debtor pursuant to its rights under the FORPPA contract is proceeds of those contract rights. UCC § 9–306(1) defines proceeds: "'Proceeds' includes *whatever* is received upon the sale, exchange, collection or *other disposition* of collateral or proceeds." (Emphasis added.) Proceeds is to be given a flexible and broad interpretation. *In re Munger*, 495 F.2d 511, 513 (9th Cir.1974); *Rainier Nat'l Bank v. Bachmann*, 111 Wash.2d 298, 757 P.2d 979, 981 (1988). The term must be construed in view of the facts surrounding the creation of the security agreement. *See Munger*, 495 F.2d at 513; *Rainier Nat'l Bank*, 757 P.2d at 981. The court must be sure not "to raise distinctions of form over the realities underlying [the] financing transaction, a result contrary to the intent of the [UCC]." *Munger*, 495 F.2d at 513.

■ As a threshold to finding the existence of proceeds, there must be a sale, exchange or other disposition of collateral. *Weisbart v. First Nat'l Bank of Dalhart, Texas*, 568 F.2d 391, 394 (5th Cir.1978).

"Other disposition" refers to those transactions not involving a sale of the collateral or its exchange for other property, but instead resulting in the collateral being substituted for some new property interest of the debtor. Thus, while the collateral is not necessarily transferred to another party, the debtor loses all rights or interests in the collateral, receiving new property in its place. *See, e.g., McGonigle v. Combs,* 968 F.2d 810, 828–29 (9th Cir.1992); *Munger,* 495 F.2d at 513; *In re Judkins,* 41 B.R. 369, 372–73 (Bankr.M.D.Tenn.1984); *In re Cupp,* 38 B.R. 953, 955 (Bankr.N.D.Ohio 1984); *Rainier Nat'l Bank,* 757 P.2d at 982.

*Munger, Judkins, Cupp,* and *Rainier Nat'l Bank* illustrate the breadth of the proceeds concept. In those cases, the secured party had a security interest in a farmer's crops or the like. The government, however, paid the farmer not to grow the crops. The issue was whether the government payments were proceeds of the crops. Each court found that the payments were proceeds of the crops, reasoning that given the circumstances surrounding the creation of the security agreement, the parties could fairly be said to have intended their agreement to reach payments not to plant crops. The payments were substituted for the crops and as such were proceeds.

Similarly, in *McGonigle v. Combs, supra,* the secured party had a purchase money security interest in stock owned by the debtor. The debtor sued the seller of the stock alleging that misrepresentations caused the stock to decline in value. A settlement was entered into. The secured party claimed the settlement funds were proceeds of the collateral. The court agreed finding "[t]here has been no sale, and no alteration in ownership, but in a broad sense there has been a 'disposition' of which the tort recovery represents the 'proceeds.'" 968 F.2d at 828. The court reasoned that in causing the stock's decline, the misrepresentations brought about a disposition of the stock, and the settlement funds, as compensation for the decline, were proceeds of the stock. *Id.*

Although the court could not find a case where inventory received by a debtor was held to be proceeds of a contract right, it did find numerous cases where the right to payment under a contract, and payment itself, were determined to be proceeds of a contract right. *See State Bank of Fraser v. United States,* 861 F.2d 954, 964–65 (6th Cir.1988); *J. Catton Farms, Inc. v. First Nat'l Bank of Chicago,* 779 F.2d 1242, 1245 (7th Cir.1985); *In re Collated Prods. Corp.,* 121 B.R. 195, 203–04 (D.Del.1990), *aff'd mem.,* 937 F.2d 596 (3rd Cir.1991); *United States v. Samel Refining Corp.,* 313 F.Supp. 684, 686–87 (E.D.Pa.1970); *In re D.J. Maltese, Inc.,* 42 B.R. 589, 592–93 (Bankr.E.D.Mich.1984).

The instant case is analogous to these cases. The only difference is that here it is the debtor-buyer, not the debtor-seller, who has given the secured party a security interest in contract rights. Therefore, any criticism that the inventory is proceeds of the money the debtor paid to FORPPA is misplaced. For similar criticism can be brought to bear against the above cases—that is, that the right to payment is proceeds of the goods sold, not the contract right exercised.

That the inventory would also be proceeds of the money paid does not preclude it from simultaneously being proceeds of the contract right. *Farnum v. C.J. Merrill, Inc.,* 264 A.2d 150 (Me.1970), resolved a priority dispute between the receiver of the debtor and a secured party. At issue was the right to the unpaid purchase price of the secured party's collateral. In addition to a perfected security interest in the collateral, the secured party had an unperfected assignment of the debtor's contract rights under the purchase order for the collateral. The security interest in the collateral had lapsed because the secured party had authorized its sale, while the security interest in contract rights was unperfected and therefore subordinate to the receiver's rights as a lien creditor under UCC § 9–301(1)(b). 264 A.2d at 152–53.

The receiver urged that the account receivable was proceeds only of the contract rights, and not of the collateral. *Farnum,*

264 A.2d at 153. The court rejected this argument. It found that the assignment of the contract rights did not alter the fact that the account receivable was proceeds of the collateral. *Id.* at 156. By analogy, the court finds that the ethanol received from FORPPA is proceeds of the debtor's rights under the FORPPA contract, notwithstanding that it would also be proceeds of the money paid.

The court is persuaded that this result was the intent of the parties in executing the security agreements and that only this result would be consistent with the facts surrounding that agreement's execution. First, as it was financing the debtor's purchase of the ethanol, ABC wanted a security interest in the ethanol. Moreover, the security agreements explicitly cover contract rights and their proceeds. The term "proceeds" would be rendered a nullity unless it included what the debtor received on exercising its contract rights. Once the debtor exercised its contract rights against FORPPA, a security interest in those rights would be of no use to ABC.

Finally, there was a disposition of the debtor's rights under the FORPPA contract. A disposition occurred each time the debtor accepted a shipment of ethanol from FORPPA. At this point the debtor lost all rights it had against FORPPA under the contract (with respect to a particular shipment of ethanol). In place of those rights, the debtor received the ethanol. Because the ethanol was substituted for the debtor's contract rights, it was proceeds of those rights.

### D. *January 1984 Security Agreement*

The debtor also gave ABC a security interest directly in inventory in January 1984. This was effective to create a security interest in favor of the bank. *See* UCC § 9–203(1). Previously given value suffices as consideration for a security interest. UCC §§ 9–203(1)(b); 1–201(44)(b); *e.g.,* *Cipriano v. Tocco,* 772 F.Supp. 344, 350 (E.D.Mich.1991); *Powers v. United States, Farmers Home Admin.,* 738 F.Supp. 174, 176 (D.S.C.1990). Although the ethanol

had been released to Haltermann, it still constituted inventory. UCC § 9–109(4).

Contrary to the debtor's allegations, it was not Jacobson who granted ABC a security interest in inventory but William B. Rowles, the Chief Executive Officer of the debtor. The document the debtor cites and Jacobson signed is the financing statement corresponding to the security agreement. Rowles's signing of the security agreement, however, sufficed to give ABC a valid security interest. Although Rowles's authority may have been limited in the same manner as Jacobson's, there have been no allegations that Rowles lacked authority to grant ABC a security interest or that ABC was aware that Rowles lacked such authority.

### E. *Significance of Prior Proceedings*

The court has not previously found that any security interest claimed by ABC was invalid. Instead, the court's earlier concerns stemmed from the possibility that the security interests might have been avoidable. Thus, the security interest in contract rights might have been avoided under § 544(a) if found to have been improperly perfected, while the security interest in inventory might have been avoided as a preference under § 547(b).

However, neither the trustee nor the debtor have pressed the lack of perfection or preferential treatment as an issue. The debtor has broadly alleged that the January 1984 security interest was a preference but has failed to address the elements of a preference or otherwise explain its assertion. In addition, this matter was filed as a contested matter in which the trustee alleged the stay had been violated. Neither the trustee nor the debtor asked that it be converted to an adversary proceeding in order to exercise the avoiding powers found in the Code. In any event the two-year statute of limitations for avoidance actions found in § 546 had long since run when this contested matter was commenced.

II. *Did the debtor have any rights in the ethanol when the petition was filed?*

Having found that ABC had a valid security interest in the ethanol, the issue arises whether the debtor had any rights in the ethanol on the petition date. The following discussion loosely tracks the course of events that led to the debtor being stripped of all rights in the ethanol.

A. *The execution of the contract between ABC and A.E. Staley did not strip the debtor of all rights in the ethanol.*

ABC asserts that the debtor no longer had any rights in the ethanol after ABC and A.E. Staley executed the contract for the sale of the 122,000 gallons of ethanol. This occurred in February 1984.

■■■ Under UCC § 9–506 the debtor loses the right to redeem the collateral once the secured party has disposed of the collateral or entered into a contract for its disposition. *Old Colony Trust Co. v. Penrose Indus. Corp.,* 398 F.2d 310, 313–14 (3rd Cir.1968). However, the fact that the right to redeem has expired does not mean that the debtor lacks any rights in the collateral so that the automatic stay no longer applies. *See Kouba v. East Joliet Bank,* 135 Ill.App.3d 264, 89 Ill.Dec. 774, 778, 481 N.E.2d 325, 329 (1985) (listing rights of Article 9 debtor after repossession). The secured party's remedies under Article 9 are only provisional, and as such, insufficient to strip the debtor of all its rights in the collateral. *United States v. Whiting Pools,* 462 U.S. 198, 206–07 & n. 14, 103 S.Ct. 2309, 2314–15 & n. 14, 76 L.Ed.2d 515 (1983); *In re Brown,* 106 B.R. 546, 549 (Bankr.N.D.Ill.1989), *rev'd on other grounds,* 126 B.R. 767 (N.D.Ill.1991). As long as the debtor has some rights in the collateral the automatic stay applies to protect the debtor's interests. *See Spencer,* 115 B.R. 471 (discussing whether automatic stay applies after redemption right expires in foreclosure proceeding); *De Souza,* 135 B.R. 793 (same); *In re Flowers,* 94 B.R. 3 (Bankr.D.D.C.1988) (same); *cf. Whiting Pools,* 462 U.S. 198, 103 S.Ct. 2309 (discussing effect of repossession in turn-

over action); *Brown,* 106 B.R. at 550–51 (discussing effect of expiration of redemption rights in turnover action).

B. *The debtor was stripped of all rights in the ethanol when the ethanol was disposed of under UCC § 9–504.*

Whether legal title is vested in the debtor or in the secured party after repossession and expiration of the redemption right is irrelevant in determining whether the debtor still has rights in the collateral. *See Yale Express,* 370 F.2d at 436–38; *United Thrift Stores,* 363 F.2d at 14–15. What is important is determining at what point in the enforcement of the provisional remedies under Article 9, the debtor no longer has any rights in the collateral.

■■■ UCC § 9–504 provides that "[w]hen collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein." UCC § 9–504(4). Thus, it is only on disposition of the collateral that the debtor is finally stripped of all rights in the collateral. This is to be distinguished from the execution of a "contract for disposition," which serves merely to extinguish the right to redeem the collateral. UCC § 9–506.

1. *The disposition of the ethanol by sale was completed before the debtor filed its petition.*

■■■ A disposition occurs when the collateral is sold: "A secured party after default may *sell, lease, or otherwise dispose of* any or all of the collateral...." UCC § 9–504(1) (emphasis added); *General Elec. Cap. Corp. v. Vashi,* 480 N.W.2d 880, 881 (Iowa 1992). Accordingly, the relevant inquiry in this case is whether the sale of the collateral to A.E. Staley occurred before the petition was filed. Resolving this issue requires resort to Article 2, which governs the sale of goods after default. UCC § 9–504(1).

Article 2 defines a "sale" as "the passing of title from the seller to the buyer for a price (Section 2–401)." UCC § 2–106(1).

UCC § 2–401 governs the passage of title. It is divided into 3 subsections. The first subsection sets outer limits for the passage of title. Thus, title cannot pass before the goods are identified to the contract, nor can the seller retain title as such after shipment or delivery to the buyer. After shipment or delivery, any retention of title by the seller results only in the reservation of a security interest. In-between these two extremes the parties are free to agree when title passes. *In re Bosson*, 432 F.Supp. 1013, 1020 n. 24 (D.Conn.1977); *In re Keystone Gen., Inc.*, 135 B.R. 275, 279 (Bankr.S.D.Ohio 1991); *Meinhard–Commercial Corp. v. Hargo Woolen Mills*, 300 A.2d 321, 323 (N.H.1972).

Subsection 2 of § 2–401 contains the general rule for passage of title. *See Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.*, 839 F.2d 1104, 1107 (5th Cir. 1988). It provides as follows (with emphasis added):

(2) Unless otherwise *explicitly* agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and *even though a document of title is to be delivered at a different time or place;* and in particular and despite any reservation of a security interest by the bill of lading

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them to destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there.

Subsection 3 of UCC § 2–401 governs the passage of title when the parties have agreed that delivery is to be made without moving the goods. *Crocker Nat'l Bank*, 839 F.2d at 1107. If no physical delivery of goods is contemplated, the time when title passes varies according to whether documents of title are to be delivered. If documents are to be delivered, title passes when the buyer receives them. UCC § 2–401(3)(a). If not, title passes at the time of contracting as long as the goods are already identified under UCC § 2–501. UCC § 2–401(3)(b).

The contract with A.E. Staley provided as follows:

In reference to our telephone conversation on barge GWL [sic] 101, Staley accepts your offer to sell approx. 120,000 net gallons, plus or minus 10 percent of anhydrous fermentation alcohol at 01.33/ net gallon F.O.B. Houston. Shipment to be made immediately on completion of processing at Halterman [sic].

Payment to be made by wire transfer against documents and specifications as specified in Contract No. 37561 on receipt of documents in our offices.

The contract indicates that the parties contemplated shipment of the ethanol and further that the shipment term was "F.O.B. Houston." The significance of the F.O.B. term is explained in UCC § 2–319(1): "Unless otherwise agreed the term F.O.B. (which means 'free on board') at a named place, *even though used only in connection with the stated price*, is a delivery term...." (Emphasis added.) If the F.O.B. term is F.O.B. the place of shipment, the seller is required to put the goods into the possession of the carrier. UCC § 2–319(1)(a). If the term is F.O.B. the place of destination, the seller must tender delivery of the goods at their destination. UCC § 2–319(1)(b). Here, the delivery term was "F.O.B. Houston," which was a place of shipment delivery term requiring ABC to put the ethanol into the possession of the carrier.

As the above discussion demonstrates, the date of delivery of the ethanol to the carrier in Houston controls the outcome of this case. On that date, by operation of law, the following simultaneously occurred. Title to the ethanol passed to A.E. Staley, UCC § 2–401(2); the sale of the ethanol was complete, UCC § 2–106(1); a disposition of collateral occurred, UCC § 9–504(1); and the debtor was stripped of all rights in the ethanol, UCC § 9–504(4). A review of the documentation of the ethanol's delivery

to the carrier shows that delivery took place in Houston on or around March 9, 1984 (but in any event well before the petition was filed on March 16, 1984, as both the trustee and the debtor concede). Accordingly, title to the ethanol had passed to Staley before the petition was filed, and therefore the debtor had no rights in the ethanol on the petition date.[3]

### 2. There was no agreement that title to the ethanol would pass after delivery to the carrier.

When the goods are to be shipped, UCC § 2–401(2) governs passage of title "[u]nless otherwise *explicitly* agreed." UCC § 2–402(2) (emphasis added). No such explicit agreement can be gleaned from the contract set forth above. That other documents must be shipped to complete the parties' transaction need not affect the passage of title under § 2–401(2). *Cf. Puamier v. Barge BT 1793,* 395 F.Supp. 1019, 1029 (E.D.Va.1974) (deciding to apply subsection 3(b), not 3(a), of UCC § 2–401). Section 2–401(2) explicitly states that title passes to the seller when the seller completes its performance with respect to the physical delivery of the goods, "even though a document of title is to be delivered at a different time or place."

Nor is the passage of title postponed by conditioning payment on receipt of documents. *Cf. Commonwealth Fin. Corp. v. DeWalt,* 198 Ill.App.3d 559, 144 Ill.Dec. 622, 623–24, 555 N.E.2d 1141, 1142–43 (1990) (cash on delivery transaction). The UCC provisions governing payment are independent of, and apply irrespective of, § 2–401. *See* UCC § 2–401 (preamble).

The paragraph calling for payment against documents is fully consistent with the F.O.B. term. Its function is to alter in two respects the treatment an F.O.B. shipment contract would normally receive under the UCC. First, it requires payment against documents. Absent a term calling for payment against documents, the buyer is required to pay after receipt and inspec-

tion of the goods, UCC §§ 2–310(a)–(b), and such payment is a condition precedent to the seller's releasing the goods to the buyer, UCC § 2–511(1). Second, the paragraph requires the seller to bear the trouble and expense of inspecting the goods, which the buyer normally would have been responsible for. UCC §§ 2–513(1)–(2).

In any event the latest the parties could have delayed the transfer of title was until A.E. Staley received the ethanol. UCC § 2–401(1); *Bosson,* 432 F.Supp. at 1020 n. 24; *Keystone Gen.,* 135 B.R. at 279; *Meinhard–Commercial,* 300 A.2d at 323. No attempt to do that is made in the paragraph calling for payment against documents. Any attempt by the parties to reserve title in the seller until the receipt of documents would only create a security interest in the seller.

### 3. The sale to A.E. Staley was not a sale on approval.

The trustee maintains that the contract called for a sale on approval so that title did not pass until the buyer accepted the ethanol. *See* UCC § 2–327(1)(a). However, to qualify as a contract for sale on approval, a contract must allow the buyer the unfettered right to return the goods irrespective of whether they conform to the contract. UCC § 2–326(1). Here, the contract contains absolutely no indication that the buyer has any such right. Accordingly, the trustee's argument is rejected. *See Associated Milk Producers, Inc. v. Indiana Dep't of State Revenue,* 512 N.E.2d 917, 919 (Ind.Tax Ct.1987), *aff'd,* 534 N.E.2d 715 (Ind.1989).

### C. The issuance of the bill of lading did not create any rights in the ethanol in favor of the debtor.

The debtor points to the bill of lading issued by the carrier and asserts that that document evidences the debtor's continued retention of an interest in the ethanol even after the filing of the petition. The bill of lading was a straight, nonnego-

---

**3.** Had A.E. Staley rejected the ethanol, title to the ethanol would have revested in the seller by operation of law. UCC § 2–401(4). This would have given rise to questions of who then owned the ethanol, the debtor or ABC. But Staley never rejected the ethanol, and the possibility that title could have revested in the seller does not alter the fact that it never did.

tiable bill which indicated that the carrier had received the ethanol from Haltermann. The bill further stated that the ethanol was consigned to the debtor but next to the debtor's name, in parentheses, was the name of ABC. The bill also listed the debtor as the shipper but again ABC was named in parentheses, this time directly below the name of the debtor.

In making its argument, the debtor contends first that ABC never obtained title to the ethanol but that title remained in the debtor until transferred to A.E. Staley on delivery to the carrier. The debtor's argument continues to the effect that under the bill of lading possession of the ethanol as security was reserved in the debtor. Accordingly, as between the debtor and Staley, the debtor concludes, the debtor had possession of the ethanol until Staley made payment which occurred after the petition was filed.

The source of the debtor's claim is UCC § 2–505(1)(b) which governs shipment under reservation by the seller. It provides in relevant part that "[w]here the seller has identified goods to the contract by or before shipment ... a non-negotiable bill of lading to himself or his nominee reserves possession of the goods as security."

At first blush the debtor's position has some appeal. The UCC broadly defines a "seller" as "a person who sells or contracts to sell goods." UCC § 2–103(1)(d). "A sale consists in the passing of title from the seller to the buyer for a price (Section 2–401)." UCC § 2–106(1). Reading the definitions of "seller" and "sale" together, it can be argued that to qualify as a seller, an entity must possess title to the goods sold. *Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F.Supp. 79, 83 (D.N.J.1990). As ABC had only a lien on the ethanol, it can be further argued that the debtor retained title to the ethanol until disposed of by the bank. *See Whiting Pools*, 462 U.S. at 206–07 & n. 14, 103 S.Ct. at 2314–15 & n. 14. Therefore, the debtor would technically be the seller under § 2–505.

The reply to the debtor is two-fold. First, it is immaterial whether title was vested in ABC or the debtor before it was transferred to A.E. Staley. On such transfer, a sale was completed under Article 2. UCC § 2–106(1). The sale constituted a disposition of the collateral under Article 9 transferring to Staley all rights the debtor had in the ethanol. *See* UCC §§ 9–504(1), (4); *see also* UCC § 2–505 cmt. 1.

Second, the bill of lading created no independent right to possession of the ethanol in the debtor. *Cf. Beaumont Oil*, 927 F.2d at 719–20 (naming bank on bill of lading did not mean bank was owner of goods). "[T]he proper method for analyzing the transactions in question is to 'look through' the form of the agreement and to examine the intent of the parties and the facts and circumstances which existed at the time of the agreements." *In re Sherwood Diversified Servs., Inc.*, 382 F.Supp. 1359, 1363–64 (S.D.N.Y.1974). Because the sale to A.E. Staley was in the first instance a disposition of collateral by a secured party under UCC § 9–504, there is no need for further inquiry into the facts and circumstances surrounding that transaction. Once ABC declared a default under Article 9, it had the exclusive right to dispose of the ethanol, and any attempt by the debtor to sell the ethanol inured to the bank's benefit. *See Oregon Bank v. Fox*, 73 Or.App. 612, 699 P.2d 1147 (1985) (finding conversion where debtor drew check on cash proceeds after notice of default). Thus, irrespective of the location of title to the ethanol, ABC, not the debtor, controlled the exercise of any rights created under § 2–505(1)(b). (The court takes no position on whether the debtor or ABC had title after default but before sale to Staley). As a result, any reservation of possession of the ethanol in the debtor after the sale was only for the benefit of ABC, and gave the debtor no rights in the ethanol.

To the extent any rights were created in the debtor under UCC § 2–505, those rights may have come into the debtor's estate under 11 U.S.C. § 541(a) (so that the debtor would have been entitled to compensation for any services actually provided ABC). *But see* 11 U.S.C. § 541(b)(1). However, any such rights must be distinguished from the rights the debtor former-

ly possessed in the ethanol. Under Article 9 the debtor lost all rights in the ethanol when title passed to A.E. Staley. The rights created in the debtor under UCC § 2–505 arose pursuant to the bill of lading and not because the debtor retained any interest in the ethanol.

That the debtor had no rights by virtue of the bill of lading is further supported by the differences between the instant transaction with Staley and previous transactions. Unlike previous transactions, the debtor had no role whatsoever after the bill of lading was issued. (Supplemental Mem. of Alcom Am. Corp. in Resp. to Second Briefing Order on Summ. J., Aff. of Joseph O. Jacobson, Ex. 6, ¶ 9.) Significantly, the debtor was not required to endorse the bill of lading to A.E. Staley as a condition to releasing the ethanol to Staley, as had been the case in the past. (Supplemental Mem. of Alcom Am. Corp. in Resp. to Second Briefing Order on Summ. J. at 2–3, 3–4.) Thus, after delivery to the carrier, the debtor had no part in transferring physical possession of the ethanol to Staley. This indicates the issuance of the bill of lading in the debtor's name was only a formality left over from the previous arrangements for delivery of the ethanol (which were utilized by ABC) but of no real significance here where ABC was exercising its rights under UCC § 9–504. *See J.P. Marks Int'l, Inc. v. Corema S.A. Empresa de Comercio e Exportacao*, 41 U.C.C.Rep.Serv. (Callaghan) 733, 739, 1985 WL 2046 (S.D.N.Y.1985).

D. *Any defects in noticing the sale of the ethanol do not warrant setting the sale aside.*

Both the trustee and the debtor allege that ABC failed to give the debtor notice of its proposed private sale to A.E. Staley. They claim ABC's conduct violated UCC § 9–504(3).

ABC responds that it did give the debtor notice and cites a letter dated March 8, 1984. Alternatively, ABC asserts that no notice was required since it retained the collateral in partial satisfaction of the debt under UCC § 9–505(2). In support of this assertion, ABC points to the notice of default sent to the debtor in January 1984.

█ ABC's argument with respect to § 9–505(2) lacks merit. To fulfill the requirements of § 9–505(2), the secured party must explicitly inform the debtor that it is retaining the collateral in satisfaction of the indebtedness. *In re Leeling*, 129 B.R. 637, 641 (Bankr.D.Colo.1991); *Vashi*, 480 N.W.2d at 882. This remedy is often referred to as "strict foreclosure." *Vashi*, 480 N.W.2d at 882.

The document ABC points to does not purport to notify the debtor of ABC's intent to retain the collateral in satisfaction of the indebtedness. It simply provides notice of default and further informs the debtor that ABC will enforce its security interest. The notice also demands payment of all amounts due. Such a demand is inconsistent with strict foreclosure. *Leeling*, 129 B.R. at 642. Therefore, a finding that ABC strictly foreclosed on the collateral is precluded for lack of notice.

The March 8, 1984 letter does not provide the debtor timely notice of the proposed sale to A.E. Staley. First, it is unclear whether the 122,000 gallons were included as part of the 7.4 million gallons whose sale is noticed in the letter. That letter references a price of $.57 a gallon while the March 9, 1984 sale to Staley was at $1.33 a gallon. Thus, it is unlikely that the 122,000 gallons were included among the 7.4 million gallons.

█ In any event, notice sent only one day before a sale is to take place is not timely. The contract with A.E. Staley was entered into on February 10, 1984, and the sale itself took place on March 9, 1984, yet the letter was dated only one day before the date of sale. To be timely, notice must arrive in time for the debtor "to take appropriate action to protect its interests." *In re Excello Press, Inc.*, 890 F.2d 896, 903 (7th Cir.1989). Even assuming the debtor received notice on March 8, 1984, one day is insufficient time to protect its interests.

On the other hand, in briefing the issues concerning title to the ethanol, the debtor insists that Jacobson orchestrated the sale of the ethanol to A.E. Staley for the benefit of the debtor. This contention is inconsis-

tent with any allegation that the debtor lacked notice of the sale.

■ The court believes that an issue of fact probably remains whether ABC gave the debtor adequate notice of its intent to sell the ethanol. However, while this issue may be genuine, it is not material. No authority exists—in New York, the District of Columbia, or any other jurisdiction—for the proposition that lack of notice to the debtor is cause for setting aside an otherwise valid sale under UCC § 9–504. That section specifically provides that a good faith purchaser for value takes free of the debtor's rights and free of the security interest "even though the secured party fails to comply with the requirements of this Part." UCC § 9–504(4). The focus is on the conduct of the buyer, not the conduct of the secured party. (No allegations have been made that A.E. Staley failed to meet the § 9–504(4) standard, nor has any evidence been cited to that effect.)

UCC § 9–507 deals with the liability of a secured party that fails to adhere to the standards governing its conduct after default by the debtor. It does not specifically establish the consequences of failing to give the debtor notice of the foreclosure sale. The various state courts, and in some cases different courts within the same state, have generally adopted three positions as to the consequences of lack of notice. 9 *Anderson on the Uniform Commercial Code* § 9–504:95 (3rd ed. 1985); *see also Excello Press*, 890 F.2d at 903–04 (applying New York law to this issue); *Fleming v. Carroll Publishing Co.*, 581 A.2d 1219, 1223–24 (D.C.1990) (applying District of Columbia law to this issue). None of these positions contemplates annulment of the sale. Therefore, no basis exists for setting aside the sale to A.E. Staley. Once that sale was completed, the debtor no longer had any rights in the collateral.

E. *That the debtor may have participated in the sale to A.E. Staley does not affect the significance of the sale as a disposition of collateral under UCC § 9–504.*

■ Finally, the trustee characterizes ABC's submission to A.E. Staley of the invoice on the debtor's letterhead as "an admission against interest." According to the trustee, ABC's use of the debtor's letterhead indicated that ABC was not enforcing its security interest but that the sale was by the debtor for the benefit of the debtor. (To the same effect, it could be argued, is the A.E. Staley telex to Jacobson, indicating Staley's acceptance of the offer to sell the ethanol.)

Whether the debtor had some part in the sale of ethanol to Staley has no impact on the status of the sale as a disposition of collateral under UCC § 9–504. There have been numerous cases where the debtor participated in the sale of the collateral or even sold the collateral, yet the sale was treated as a disposition by the secured party under UCC § 9–504. *See In re Long*, 83 B.R. 579, 580–81 (Bankr.E.D.Ark.1987); *Stockdale, Inc. v. Baker*, 364 N.W.2d 240, 243 (Iowa 1985); *Ambase Int'l Corp. v. Bank South*, 196 Ga.App. 336, 395 S.E.2d 904, 907 (1990); *United Bank of Denver v. Reed*, 635 P.2d 922, 924 (Co.Ct.App.1981). What is crucial in this respect is the debtor's receipt of notice of default and intent to enforce the security interest from the secured party. *Oregon Bank v. Fox*, 73 Or.App. 612, 699 P.2d 1147, 1149 (1985); *see Adcock v. First City Bank of Alice*, 802 S.W.2d 305, 306–07 (Tex.Ct.App.1990). In fact, after receipt of such notice, any sale by the debtor without the secured party's consent constitutes conversion of the collateral. *See Oregon Bank*, 699 P.2d at 1149–50.

In this case, ABC gave the debtor notice of default and declared its intent to enforce its security interest in the ethanol. The sale to A.E. Staley took place after that. Therefore, the sale was a disposition within the meaning of UCC § 9–504.

III. *Did ABC violate § 362(a)(6) by mailing A.E. Staley an invoice for the ethanol and depositing payment in its own account?*

■ The trustee maintains that no matter when title passed, ABC's postpetition

actions violated the automatic stay. According to the trustee, § 362(a)(6) bars any postpetition act to collect on a prepetition claim regardless of whether the collection effort is directed against property of the estate or of the debtor. Based on this assertion, the trustee concludes that ABC violated the automatic stay when it mailed the invoice to A.E. Staley and when it deposited Staley's check in its own account.

Section 362(a)(6) stays "any act to collect, assess, or recover a [pre-petition] claim against the debtor." The Code defines "claim" in relevant part as "right to payment." 11 U.S.C. § 101(5). It further provides as a rule of construction that "claim against the debtor" includes "claim against property of the debtor." 11 U.S.C. § 102(2). These definitions should be contrasted with the definition of "debt" which means "liability on a claim." 11 U.S.C. § 101(12).

ABC's postpetition actions cannot fairly be said to be acts to collect a claim against the debtor or against property of the debtor. In submitting the invoice and delivering the relevant documents, ABC completed the last step in the performance required of it under the contract with A.E. Staley. *See* UCC § 2–504. In so doing, ABC fixed its claim against Staley. *See* UCC § 2–507(1). This claim should be distinguished from ABC's claim against the debtor which had a completely different factual predicate and legal basis. Thus, at the time the petition was filed, ABC had two separate and independent claims—one against Staley (although inchoate) and one against the debtor. Because the claims were separate and independent, ABC's postpetition actions are properly regarded as acts "to collect, assess, or recover" the bank's claim against A.E. Staley, not its claim against the debtor. As such, ABC's postpetition conduct did not violate § 362(a)(6). Although the collection of the claim against Staley may have effected a credit in the same amount in the debtor's favor,[4] the proper focus is who was liable on the contract of sale being enforced.

That entity was A.E. Staley, and any credit in the debtor's favor was only incidental to the collection efforts against Staley.

Equally applicable to this case is the reasoning underlying those cases holding that an action against non-debtor property pledged as security for a debt of the debtor is not an action to collect or recover a claim against the debtor. In *In re Advanced Ribbons and Office Prods., Inc.*, 125 B.R. 259 (9th Cir. BAP1991), the court held that the automatic stay was not violated when a creditor foreclosed against stock the debtor's sole shareholder pledged as security for the debtor's debt. The debtor had argued that the shareholder was not individually liable on the debt and therefore the foreclosure sale was an act to collect a claim against the debtor. 125 B.R. at 264.

In refuting the debtor's argument, the court found the shareholder's lack of personal liability to be irrelevant. What was relevant was whether the creditor had a claim against the nondebtor separate and independent of any claims against the debtor. The court found that the creditor had such a claim against the shareholder's property, as opposed to the creditor's claims against the debtor and the debtor's property. The foreclosure sale was thus an act to collect a claim against the shareholder's property. *Advanced Ribbons*, 125 B.R. at 264.

The court further reasoned that the claim against the shareholder's property was in essence a claim against the shareholder. Although not personally liable, the shareholder had a nonrecourse obligation to the creditor. Therefore, the court concluded, the foreclosure sale could also properly be viewed as an act to collect a claim against the shareholder. *Advanced Ribbons*, 125 B.R. at 264.

On similar facts, the court in *In re Torrez*, 132 B.R. 924 (Bankr.E.D.Cal.1991), drew a distinction between acts to recover a "claim" (or "right to payment") against the debtor and acts to recover a "debt" (or "liability on a claim") owed by the debtor. *Id.* at 943. Acts to satisfy the debtor's

---

**4.** The court has not attempted to determine whether a credit arose in the debtor's favor when title passed to A.E. Staley or only when Staley made payment.

"debt" by collecting an independent "claim" against a nondebtor are not forbidden by § 362(a)(6). *Id.* Looking at the plain language of the statute, the court held "[t]he only interpretation of 11 U.S.C. § 362(a)(6) warranted is that it precludes acts to collect, assess, or recover *a claim against the debtor only.*" *Id.* at 944 (emphasis added).

This court agrees with the court in *Torrez* that cases such as *Valley Transit Mix of Ruidoso, Inc. v. Miller,* 928 F.2d 354 (10th Cir.1991), incorrectly invoke § 362(a)(6) where the creditor's collection act is against property of a non-debtor. *See Torrez,* 132 B.R. at 942–43. *Valley Transit Mix of Ruidoso* and similar cases are nevertheless correctly decided because the creditor's action results in the destruction of the debtor's leasehold or possessory interest. The act therefore amounts to an act to obtain property of the estate in violation of § 362(a)(3). *See In re 48th Street Steakhouse, Inc.,* 835 F.2d 427 (2d Cir. 1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988); *see also* 1 David G. Epstein et al., *Bankruptcy* § 3.8 n. 2 (1992) (drawing same conclusions).

The cases cited by the trustee are distinguishable from cases such as *Advanced Ribbons, Torrez,* and the instant case. The trustee's cases involved either acts designed to coerce the debtor into paying a prepetition debt, *In re Guinn,* 102 B.R. 838, 841–42 (Bankr.N.D.Ala.1989) (cancellation of credit union membership in effort to attain reaffirmation of unsecured debts); *In re Dembek,* 64 B.R. 745, 749–50 (Bankr. N.D.Ohio 1986) (refusal to provide transcript of records until payment of delinquent tuition), or acts against a nondebtor without a separate and independent claim against the nondebtor, *In re Express America, Inc.,* 132 B.R. 535, 539 (Bankr. W.D.Pa.1991) (collection of accounts receivable assigned outright to debtor); *In re Zunich,* 88 B.R. 721, 724 (Bankr.W.D.Pa. 1988) (collection of judgment against garnishee bank). Although the creditor in *Zunich* did have a prepetition judgment against the garnishee bank, the judgment was not on an independent claim against the bank, but derivative of the claim against the debtor, serving only as a determination that the bank, as garnishee, in fact possessed the debtor's property. *See* Pa.R.Civ.P. Nos. 3146, 3147 (governing effect of judgment against garnishee in *Zunich* ); *In re O'Connor,* 42 B.R. 390, 392 (E.D.Ark.1984). Finally, in both *Zunich* and *Express America,* the property sought by the creditor constituted property of the estate. *Express America,* 132 B.R. at 539–40; *Zunich,* 88 B.R. at 724.

## CONCLUSION

Based on the foregoing, it is

ORDERED that the trustee and the debtor shall have 10 days from entry of this order in which to submit any evidence demonstrating the existence of a genuine issue of material fact; it is further

ORDERED that the submission of evidence will stay the entry of an order granting summary judgment in favor of ABC until the court has had an opportunity to evaluate the evidence and take appropriate action; it is further

ORDERED that if the trustee or the debtor submit evidence, ABC shall have 10 days from the end of the initial 10 day period in which to counter the evidence submitted by the trustee or the debtor; and it is further

ORDERED that in the absence of the submission of evidence by the trustee or the debtor, the court will enter a separate order, treating this decision as the court's final decision, and granting summary judgment in favor of ABC (and in favor of the trustee against the debtor).